UNITED STATES of America, Appellee,

v.

Shane WELCH, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Christopher DRIESSE, Defendant, Appellant.

Nos. 92–1368, 92–1370.

United States Court of Appeals, First Circuit.

Heard June 15, 1993.

Decided Dec. 30, 1993.

Stay of Mandate Dissolved Dec. 30, 1993.

Paul J. Haley, with whom Scott L. Hood and The Law Office of Paul J. Haley, P.A., were on brief, for appellant Shane Welch.

John P. Rab, for appellant Christopher Driesse.

Terry L. Ollila, Sp. Asst. U.S. Atty., with whom Peter E. Papps, U.S. Atty., was on brief, for appellee.

Before SELYA, CYR and BOUDIN, Circuit Judges.

CYR, Circuit Judge.

This opinion addresses the separate appeals of Christopher Driesse and Shane Welch, two youthful defendants who were convicted of conspiring with their ten adult codefendants to possess and distribute cocaine, *see* 21 U.S.C. § 846 (1988), as part of a New Hampshire drug distribution ring led by David Sepulveda during the period 1985–90. *See United States v. Sepulveda,* (1st Cir. 1993) [15 F.3d 1161] (affirming convictions of ten codefendants);[1] *see also United States v. Sepulveda* (1st Cir.1993) [15 F.3d 1216] (affirming denial of post-trial motion for dismissal or new trial based on newly discovered evidence). These appeals are accorded separate treatment primarily because Driesse and Welch initiated their participation in the Sepulveda conspiracy prior to their eighteenth birthdays. Although both came of age while their involvement in the criminal alliance continued, appellants contend that the district court lacked jurisdiction and deprived them of their rights under the Federal Juvenile Delinquency Act, 18 U.S.C. §§ 5031–5042 (1988 & Supp.1992) (FJDA).

## I. *Appellants' Common Claims Under FJDA.*

Appellants, whose participation in the Sepulveda conspiracy spanned their eighteenth birthdays, challenge their convictions on the grounds that the district court failed to comply with the FJDA by refusing to: (1) conduct a pretrial evidentiary hearing to determine its jurisdiction to try appellants as adults; (2) sever their trial from their ten codefendants; (3) instruct the jury that conduct prior to their eighteenth birthdays ("pre-majority conduct") could not evidence their guilt; and (4) grant their motion to dismiss, based on insufficient evidence of their post-majority participation in the conspiracy.[2]

### A. *Pretrial Hearing on Jurisdiction.*

██ Appellants first maintain that the FJDA divested the district court of jurisdiction to try them as adults unless some of their conspiratorial conduct occurred after they reached eighteen years of age ("post-majority conduct"). Since appellants contested the factual basis for the charge that they participated in the Sepulveda conspiracy after attaining their majority, they insist that the FJDA required a *threshold* evidentiary hearing on their jurisdictional claim *before they could be subjected to trial as adults.*[3] We do not agree.

██ The FJDA defines a "juvenile" as "a person who has not attained his eighteenth birthday, *or* for the purposes of proceedings and disposition under this chapter for an *alleged act of juvenile delinquency,* a person who has not attained his twenty-first birthday...." 18 U.S.C. § 5031 (emphasis added).[4] Both Welch and Driesse were between

---

1. We refer the reader to the main *Sepulveda* decision for factual detail not directly relevant to these separate appeals. *See Sepulveda,* [15 F.3d 1161].

2. Driesse became eighteen on April 6, 1988; Welch on November 20, 1989.

3. Apparently satisfied that the *allegations* of appellants' *post*-majority conduct were sufficient to satisfy the FJDA, the district court denied their pretrial motions to dismiss the indictment for lack of jurisdiction, as well as their requests for a pretrial evidentiary hearing.

4. The FJDA's remedial scheme focuses primarily on the circumstances of the alleged offender, particularly the offender's *current* prospects for rehabilitation outside the adult criminal justice system, and only secondarily on the offender's age at the time of the alleged offense. Accordingly, even conduct that occurred entirely before age eighteen has been held not wholly exempt from adult criminal prosecution. *See United States v. Hoo,* 825 F.2d 667, 670 (2d Cir.1987) (accused indicted after twenty-first birthday is criminally liable, as an adult, for illegal conduct committed *entirely before* age eighteen), *cert. denied,* 484 U.S. 1035, 108 S.Ct. 742, 98 L.Ed.2d 777 (1988); *In re Martin,* 788 F.2d 696, 697–98

ages eighteen and twenty-one at the time of their indictment. "Juvenile delinquency" is defined as "the violation of a law of the United States committed by a person *prior to his eighteenth birthday* which would have been a crime if committed by an adult." *Id.* (emphasis added). Thus, the FJDA does not apply to "a defendant who ... is not a juvenile and who has not committed an act of juvenile delinquency." *United States v. Doerr,* 886 F.2d 944, 969 (7th Cir.1989).

■ Generally speaking, it is readily apparent whether a non-continuing substantive violation was committed prior to or after the alleged offender's eighteenth birthday. *See United States v. Cruz,* 805 F.2d 1464, 1477 n. 15 (11th Cir.1986), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 *and cert. denied,* 482 U.S. 930, 107 S.Ct. 3215, 96 L.Ed.2d 702 (1987). On the other hand, a criminal conspiracy—often a continuing offense—may persist long past its commencement, sometimes spanning the eighteenth birthday of an alleged conspirator. *See United States v. Gjonaj,* 861 F.2d 143, 144 (6th Cir.1988); *see also United States v. Giry,* 818 F.2d 120, 135 (1st Cir.), *cert. denied,* 484 U.S. 855, 108 S.Ct. 162, 98 L.Ed.2d 116 (1987).[5]

The government asserts that the FJDA is inapplicable to appellants simply because the indictment *charged* that the conspiracy spanned their eighteenth birthdays. Appellants counter that the FJDA's applicability in a conspiracy case ought not depend conclusively on bare allegations as to the time period spanned by the conspiracy or the defendant's membership in it. On balance, however, we find the allegation-based approach to FJDA applicability more consonant with its language and structure, its legislative history, the case law, and important policy considerations.

■ Prosecutorial discretion is a hallmark of the criminal justice system. *See Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985) ("[T]he decision whether or not to prosecute, and what charges to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion.") (quoting *Bordenkircher v. United States,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978)). Notwithstanding several amendments expanding the role of the courts, the FJDA continues to impart considerable prosecutorial discretion as to whether an accused will be tried as an adult even though the criminal conduct charged qualifies as an act of juvenile delinquency.[6] For example, pursuant to

---

(11th Cir.) (same), *cert. denied,* 478 U.S. 1009, 106 S.Ct. 3306, 92 L.Ed.2d 719 (1986). Of course, given that Welch and Driesse were under age twenty-one at indictment, this precise issue is not before us.

5. The term "alleged act," as used in § 5031, means the alleged offense, not each separate act comprising the offense. Thus, the FJDA cannot be read to preclude an adult conspiracy prosecution simply because the accused's participation in the conspiracy *began* while he was under age eighteen—or in other words, because he committed an "act" in furtherance of the conspiracy prior to age eighteen which might be viewed independently as an "act of juvenile delinquency." *See, e.g., Cruz,* 805 F.2d at 1475 (citing *United States v. Spoone,* 741 F.2d 680, 687 (4th Cir.1984)). Otherwise, defendants age 18–21 would be insulated from criminal prosecution simply because they got an early start. Neither does the FJDA make the defendant's age at the time of the offense a substantive "element" of every criminal offense. *See United States v. Frasquillo–Zomosa,* 626 F.2d 99, 101 (9th Cir.), *cert. denied,* 449 U.S. 987, 101 S.Ct. 405, 66 L.Ed.2d 249 (1980).

6. Enacted in 1938, the FJDA originally provided absolute discretion to the Attorney General to try juvenile offenders as adults. *See* 18 U.S.C. § 921 (1940); *see also United States v. Quinones,* 516 F.2d 1309, 1311 (1st Cir.) (per curiam) (finding no due process right to judicial hearing prior to adult trial), *cert. denied,* 423 U.S. 852, 96 S.Ct. 97, 46 L.Ed.2d 76 (1975). In order to "incorporate the rehabilitative concept of a juvenile proceeding," S.Rep. No. 1011, 93d Cong., 2d Sess. 48 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5283, 5312, thereby minimizing the involvement of young offenders in the juvenile and criminal justice systems, *id.* at 5285, in 1974 Congress substantially amended the FJDA, *see* Pub.L. No. 93–415, 88 Stat. 1109, 1133–38 (1974) (codified as amended at 18 U.S.C. §§ 5031–42), permitting adult trials of juveniles only after a judicial hearing and determination that "transfer" for trial as an adult would serve the interests of justice. Pub.L. No. 93–415, Title V, Part A, § 502, 88 Stat. at 1134 (codified as amended at 18 U.S.C. § 5032).

18 U.S.C. § 5032 the government may bring a motion to transfer a juvenile defendant to the district court for trial as an adult if the juvenile is at least fifteen years of age and the government alleges that the juvenile committed certain enumerated "transferable" offenses (*e.g.*, violent crimes or controlled substance violations). Although "transfer" is subject to an "interest of justice" test as well, the district court nonetheless may assume, without receiving evidence, that the government's factual allegations relating to the character of the offense are true. *See In re Sealed Case*, 893 F.2d 363, 369 (D.C.Cir. 1990); *United States v. Doe*, 871 F.2d 1248, 1250 n. 1 (5th Cir.), *cert. denied*, 493 U.S. 917, 110 S.Ct. 276, 107 L.Ed.2d 257 (1989). Yet more to the point, section 5032 permits the government to implement—again, on mere allegation, without prior hearing or judicial authorization—the mandatory "transfer" of a *recidivist* juvenile offender for trial as an adult. *See* Pub.L. No. 98–473, Title II, ch. XII, Part A, § 1201, 98 Stat. 1837, 2149–50 (1988).[7] Given the breadth of Congress's consignment of other "jurisdictional" determinations to the prosecutor's discretion under the FJDA, it is not surprising that appel-

lants cite no case law directly supporting their asserted right to a pretrial evidentiary hearing on the district court's jurisdiction to try them as adults.[8]

■ Our interpretation comports with three basic policy concerns as well. First, neither appellant was unfairly prejudiced by the district court's decision to defer its determination of the applicability of the FJDA until trial. Congress did not amend the FJDA primarily in order to confer greater procedural rights on juveniles than are available to adults, but to assure that the procedural rights afforded juveniles would be *augmented* to a level *comparable* to those available to adults. *See* S.Rep. No. 1011, 93d Cong., 2d Sess. 47–48 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5283, 5312 (FJDA simply codifies "safeguards fundamental to our system of justice," per *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)). In fact, alleged offenders between the ages of eighteen and twenty-one at indictment often receive *more* procedural protections under the adult criminal justice system than would be available under juvenile process.[9]

7. It might be argued that the language of § 5032 is ambiguous on the necessity for a district court hearing prior to the mandatory "transfer" of a recidivist juvenile. *See* 18 U.S.C. § 5032 (connector term "however" follows provision for "interests of justice" transfer, which requires hearing, but precedes recidivism provision, which is silent as to hearing requirement). Nevertheless, the legislative history makes clear that the recidivism provision was intended as an absolute exception to the hearing requirement. S.Rep. No. 225, 98th Cong., 1st Sess. 390–91 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3530–31 (recidivism transfer "mandatory" "upon motion of the government").

8. Appellants rely primarily on *Cruz*, 805 F.2d 1464, where the Eleventh Circuit noted that, *"once* sufficient evidence has been introduced that would allow a jury to reasonably conclude that the defendant's participation in a conspiracy continued after his eighteenth birthday, then he may be tried as an adult." *Id.* at 1476 (emphasis added). Appellants interpret the word "once" as indicating a *temporal* requirement that the government submit sufficient proof of post-majority participation *before* it can subject them to trial as adults. However, the context makes clear that the *Cruz* court was simply evaluating the jurisdictional issue in light of the sufficiency of the evidence presented *at trial*, and that it was addressing the threshold requirements for admit-

ting evidence of pre-majority conduct in support of defendant's conviction as an adult, not for purposes of establishing *jurisdiction to try* defendants as adults. *Id.* at 1476–77. Thus, evidence of the defendant's pre-majority conduct was admissible on the ultimate issue of guilt, and not merely to show knowledge of the conspiracy. *See infra* Pt. I.B.

Other cases cited by appellants, relying on *Cruz*, suffer from the same misfocus and, if anything, suggest that the appropriate vantage for determining such jurisdictional facts is after all the evidence has been presented at trial. *See United States v. Maddox*, 944 F.2d 1223, 1233–34 (6th Cir.) ("evidence was more than sufficient for the jury to conclude . . ."), *cert. denied*, —— U.S. ——, ——, 112 S.Ct. 400, 610, 116 L.Ed.2d 349, 633 (1991), *and cert. denied*, —— U.S. ——, 112 S.Ct. 948, 1219, 1978, 2317, 117 L.Ed.2d 117 (1992); *United States v. Harris*, 944 F.2d 784, 786 (10th Cir.1991) ("since the government had presented evidence from which the jury could infer . . ."), *cert. denied*, —— U.S. ——, 112 S.Ct. 903, 116 L.Ed.2d 804 (1992); *Gjonaj*, 861 F.2d at 143–44 (finding evidence sufficient for judge to sentence defendant as adult after guilty plea).

9. For example, a felony charge against an adult presupposes indictment by a grand jury, *see* U.S. Const. amend. V, while the FJDA permits a pros-

Second, the proposed pretrial evidentiary hearing would place an unwarranted burden on the prosecution, especially in multi-defendant conspiracy cases where most alleged coconspirators are adults. Regardless of the precise burden of proof applicable at the pretrial evidentiary hearing, the government would no doubt be expected to present substantial evidence outlining the alleged conspiracy, thereby prematurely "tipping its hand" on trial strategy and the testimony of its witnesses. *See* 18 U.S.C. § 3500(a) (Jencks Act); Fed.R.Crim.P. 16(a)(2). Furthermore, we do not think a pretrial hearing would significantly enhance the procedural protection of youthful defendants already indicted by a grand jury.

▉▉ Finally, the issue of district court "jurisdiction" in cases implicating the FJDA seems to us sufficiently similar to other fact-bound defenses to tip the balance in favor of a determination by the trial jury. *See infra* Pt. I.C. Appellants could only be convicted as adults if they "participated" in, or "ratified" the conspiracy, after age eighteen. *See United States v. Maddox,* 944 F.2d 1223, 1233 (6th Cir.), *cert. denied,* — U.S. —, —, 112 S.Ct. 400, 610, 116 L.Ed.2d 349, 633

(1991), *and cert. denied,* — U.S. —, —, —, —, 112 S.Ct. 948, 1219, 1978, 2317, 117 L.Ed.2d 117, 456, 118 L.Ed.2d 577, 119 L.Ed.2d 236 (1992). A finding of "participation" or "ratification" ordinarily depends heavily upon (i) common-sense evaluations of the youthful defendants' actions—viewed in the context of the criminal enterprise and the conduct of their coconspirators—and (ii) inferences as to the state of mind of the various actors. *See United States v. Lopez-Pena,* 912 F.2d 1536, 1537 (1st Cir.1989) (conspiracy requires that "the individual defendant knew of the agreement, had intent to agree, and had intent to commit the substantive offense"), *cert. denied,* — U.S. —, 111 S.Ct. 2886, 115 L.Ed.2d 1052 (1991). These are matters especially suited to jury resolution. *See United States v. Piedrahita-Santiago,* 931 F.2d 127, 130 (1st Cir.1991) ("It is the province of the jury, not this court, to determine the credibility of the witnesses."); *cf. United States v. Passos-Paternina,* 918 F.2d 979, 985 (1st Cir.) ("We defer, within reason, to inferences formulated by the jury in light of its collective understanding of human behavior in the circumstances revealed by the evidence."), *cert. denied,* 499

---

ecutor to level an equivalent charge simply by information, *see* 18 U.S.C. § 5032. An adult accused has the fundamental right to trial by jury. *See* U.S. Const. amend. VI; Fed.R.Crim.P. 23. *But see* 18 U.S.C. § 5037 (juvenile verdict by judge); *McKeiver v. Pennsylvania,* 403 U.S. 528, 545, 91 S.Ct. 1976, 1986, 29 L.Ed.2d 647 (1971) (finding no constitutional right to jury trial in juvenile proceedings); *United States v. Bent,* 702 F.2d 210, 212 (11th Cir.1983) (applying *McKeiver* to federal juvenile proceedings).

To be sure, the FJDA extends certain pretrial protections not available under the adult criminal justice system, including separate pretrial incarceration at juvenile facilities, *see* 18 U.S.C. §§ 5033, 5035, and a ban on pretrial publicity relating to the offense, *see id.* § 5038(e). Assuming, without deciding, that these protections confer a cognizable "right," *see, e.g., In re Sealed Case,* 893 F.2d at 366–67 (in § 5032 "transfer" proceeding, denial of separate incarceration or of protection from pretrial publicity is immediately appealable), appellants do not expressly assert deprivation of either of these "rights" as a ground for their jurisdictional challenge. *See United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.) (issues raised on appeal, without adequate argumentation, are deemed waived), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944

(1990); *United States v. Baker,* 10 F.3d 1374, 1396–97 (9th Cir.1993) (juvenile defendant waives challenge to incarceration with adults unless objection raised in district court).

Appellants' reticence is perhaps understandable. Driesse was in *state* custody, hence never subjected to pretrial detention on these federal charges. Welch originally was released on bail, but bail was revoked because he repeatedly violated the conditions of release. Although the district court ordered Welch detained at a "corrections facility" pending trial, neither Welch nor the appellate record describes the place or precise conditions of confinement, affording us no basis for assessing whether the FJDA was violated. Finally, whatever plausible argument Welch might have made about any harm attending adult incarceration would be considerably weakened by the intervening bail violation.

Moreover, since § 5038(e) expressly conditions the ban on pretrial publicity (even for defendants under age eighteen at the time of indictment) on the prosecutor's *discretionary* decision not to "transfer," we perceive no principled basis for deeming any attendant publicity sufficient reason for foreclosing prosecutorial discretion over appellants' "transfer." *See* 18 U.S.C. § 5038(e) ("Unless a juvenile who is taken into custody is prosecuted as an adult....").

U.S. 982, ———–———, 111 S.Ct. 1637, 2808–09, 113 L.Ed.2d 732, 115 L.Ed.2d 980–81 (1991).[10] Properly instructed in the performance of their traditional tasks, trial juries can be entrusted to discriminate between pre-majority and post-majority conduct. *See, e.g., Cruz,* 805 F.2d at 1476. We therefore conclude that the FJDA's language, structure, legislative history, and related policy considerations, militate against requiring a pretrial evidentiary hearing on jurisdiction.

### B. *Severance.*

■ Appellants next contend that the district court committed reversible error by denying their motion for severance, *see* Fed. R.Crim.P. 14, since (1) the evidence against their ten adult codefendants was so voluminous, in comparison with the meager evidence against appellants, that the jury would indiscriminately lump appellants together with the adults, and (2) the government was entitled to introduce evidence of appellants' pre-majority conduct against the adult codefendants, whereas the FJDA prohibits, or severely limits, the admissibility of such evidence against appellants.

■ A motion for severance is committed to the sound discretion of the trial court, and we review only for a manifest abuse of discretion resulting in a miscarriage of justice. *See United States v. McLaughlin,* 957 F.2d 12, 18 (1st Cir.1992). In order to gain severance, a defendant must make a "strong showing [that] substantial prejudice" would result from a joint trial. *See United States v. Barnett,* 989 F.2d 546, 559 (1st Cir.), *cert. denied,* 114 S.Ct. 148, 149, 126 L.Ed.2d 110 (1993); *United States v. Martinez,* 922 F.2d 914, 922 (1st Cir.1991) (noting that " 'prejudice means more than just a better chance of acquittal at a separate trial' ") (citation omitted). Appellants have not shown especial prejudice.

■ The existence of stronger evidence against their codefendants did not entitle appellants to automatic severance on grounds of evidentiary spillover. *See United States v. Cresta,* 825 F.2d 538, 554–55 (1st Cir.1987), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988). Nor does the relatively minor conspiratorial role of a particular defendant normally preclude a joint trial with more prominent codefendants. *See Martinez,* 922 F.2d at 922. Adequate safeguards are available to protect against undue prejudice from evidentiary spillover in most cases. For example, the district court carefully cautioned the jury in the present case to consider the evidence against each individual defendant. *See Cresta,* 825 F.2d at 555. Absent a contrary showing or some evidence of an extraordinary impediment, we will credit the readiness and ability of the trial jury to abide by cautionary and limiting instructions aimed at minimizing the mundane risks of evidentiary spillover. *See United States v. Figueroa,* 976 F.2d 1446, 1452 (1st Cir.1992) (citing *United States v. Natanel,* 938 F.2d 302, 308 (1st Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992)), *cert. denied,* — U.S. —, 113 S.Ct. 1346, 122 L.Ed.2d 728 (1993).

■ Next, appellants argue that severance was required because evidence of their pre-majority conduct was admissible against all their codefendants, but not against them. Since prejudicial evidentiary spillover cannot result from evidence directly admissible against all defendants, *Figueroa,* 976 F.2d at 1452 (citing *United States v. Sabatino,* 943 F.2d 94, 96 (1st Cir.1991)), appellants must establish that evidence of their pre-majority membership and participation in the conspiracy was not directly admissible to support their convictions.

---

**10.** In fact, the FJDA expressly requires very similar evidentiary monitoring by the jury once the prosecutor's allegations have led to a youthful defendant's trial as an adult. After a juvenile has been transferred for trial as an adult, whether by transfer hearing or mandatory process, *see supra* note 6 and accompanying text, unless the jury also *convicts* the accused of a transferable crime the accused is returned for disposition under the FJDA. *See* 18 U.S.C. § 5032 (listing types of crimes permitting "transfer"). Even the FJDA amendments of 1984, which conferred significant "transfer" discretion upon the prosecutor, kept these "return" provisions in place on the theory that jury involvement, after factual corroboration at trial, provides a valuable case-by-case assessment of the appropriateness of juvenile process. *See* S.Rep. No. 225, 98th Cong., 1st Sess. 391 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3531.

Appellants argue, relying on dicta in *United States v. Spoone*, 741 F.2d 680, 687–88 (4th Cir.1984), *cert. denied*, 469 U.S. 1162, 105 S.Ct. 917, 83 L.Ed.2d 929 (1985), that use of evidence of pre-majority conduct must be limited as urged by appellants even though cautionary instructions are given. In *Spoone*, the Fourth Circuit determined that evidence of pre-majority conduct had not formed the sole basis for the defendant's conviction, and therefore that the FJDA could not have been violated. *Id.* The jury charge in *Spoone* instructed, *inter alia*, that pre-majority conduct could provide context for evaluating the defendant's *knowledge* of the conspiracy, as an aid in assessing *evidence of his conduct after age eighteen*. *Id.*

■ We think the better view is that adopted in *Cruz*, 805 F.2d 1464: "once [the government] ha[s] established that certain acts of the offense occurred after the defendant's eighteenth birthday, the entire case may be tried in accordance with the adult rules of procedure and evidence." *Id.* at 1477. *See supra* note 8; *see also Doerr*, 886 F.2d at 969–70 (adopting *Cruz* approach). We are not persuaded that the restrictions advocated by appellants would afford significantly greater protection than appropriate cautionary and limiting instructions. We therefore hold that a criminal defendant's pre-majority conduct is admissible on the same bases as other evidence, and does not alone compel severance of a youthful defendant's trial.

## C. Jury Instructions.

■ Appellants further contend that the instructions did not properly limit jury consideration of their pre-majority conduct. Al-

though evidence of their pre-majority conduct was admissible against appellants for all purposes, *see Cruz*, 805 F.2d at 1477, we reject any proposed reliance on *Cruz* for the proposition that the trial judge is the sole and final arbiter of the threshold determination as to the sufficiency of the evidence of *post*-majority conduct, or that further limiting instructions to the jury are unnecessary once the evidentiary threshold has been met to the satisfaction of the trial court. *See id.* at 1476–77; *see also Doerr*, 886 F.2d at 970 (once the evidentiary threshold has been met, the trial is "limited only by the Federal Rules of Evidence").[11] An age-of-majority-spanning conspiracy is somewhat analogous to a criminal conspiracy that spans a bar date imposed by the statute of limitations. *See Maddox*, 944 F.2d at 1233; *Gjonaj*, 861 F.2d at 144. Although evidence of both pre- and post-bar date conduct is fully admissible in such a case, the jury nonetheless must be instructed to acquit a defendant who *withdrew* from the conspiracy before the bar date. *See United States v. Piva*, 870 F.2d 753, 756–57 (1st Cir.1989); *see also United States v. Juodakis*, 834 F.2d 1099, 1102–04 (1st Cir.1987) (per curiam).

■ The statute of limitations analog is imperfect, of course. The temporal demarcation under the FJDA is not identical to a statute-of-limitations bar date, nor does it necessarily follow that appellants could be convicted as "adults" simply because there was no evidence that they withdrew from the age-of-majority-spanning conspiracy prior to attaining age eighteen.[12] A more apt analogy for FJDA cases involving age-of-majority-spanning conspiracies may be the contract "ratification" doctrine, which provides that a minor legally incapable of contracting may

11. The approach approved in *Cruz* and *Doerr* appears to be based on Fed.R.Evid. 404(b), which allows evidence of a defendant's prior wrongful acts on such issues as motive and intent. However, in an age-of-majority-spanning conspiracy, the defendant's pre-majority conduct is not merely extrinsic evidence of a prior wrongful act, but an integral component of the alleged conspiracy for which he is on trial.

12. Statute-of-limitations bar dates serve extrinsic ends. *See, e.g., Toussie v. United States*, 397 U.S. 112, 114–15, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970) (limitations period protects individuals

from charges brought after the basic facts have been obscured by time, and fosters diligent law enforcement). On the other hand, the "withdrawal" defense promotes the reporting, and preemptive thwarting, of criminal conspiracies. *See Piva*, 870 F.2d at 757.

By the same token, in some instances the FJDA *decriminalizes pre*-majority conduct by divesting federal courts of criminal jurisdiction and establishing a separate juvenile justice system whose primary focus is on offender rehabilitation. *See* 18 U.S.C. § 5032; *see also* S.Rep. No. 1011, *supra* note 6; *In re Sealed Case*, 893 F.2d at 367.

**1212**

nonetheless affirm by his post-majority conduct. *See Maddox*, 944 F.2d at 1233 ("a person who does absolutely nothing" after age of majority cannot be held liable as adult) (citing John D. Calamari and Joseph M. Perillo, *Contracts* § 8–4 (3d ed. 1987)). We think the *Maddox* analogy better comports with the fundamental principle that criminal liability is premised on some discernible *actus reus*, be it action or (in an appropriate case) intentional inaction. *See United States v. Bishop*, 469 F.2d 1337, 1348 (1st Cir.1972) (Constitution prohibits punishment for mere status) (citing *Powell v. Texas*, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968)); *see generally* 1 Wayne LaFave & Arthur Scott, *Substantive Criminal Law* §§ 3.2–.3 (1986). Under the *Maddox* approach, therefore, rather than face conviction simply for failing to "withdraw" from the age-of-majority-spanning conspiracy prior to attaining age eighteen, there could be no conviction unless the jury found that appellants in some manner "ratified" their participation in the conspiracy after attaining majority.[13]

 In all events, whatever the precise contours of the "ratification" theory in the context of an age-of-majority-spanning conspiracy, the instructions in this case required significantly more post-majority conspiratorial conduct than the FJDA mandates. The district court instructed the jury as follows:

> [T]he defendant's juvenile acts may not be considered as proof of his participation in the conspiracy unless the jury first finds that he participated in the conspiracy after his eighteenth birthday.... In other words, *you can't consider the acts before their eighteenth birthday unless you first find beyond a reasonable doubt that they participated in the conspiracy after they attained the age of eighteen years.*

(Emphasis added.) The challenged instruction effectively required the jury to determine whether evidence of appellants' post-

majority participation *in itself* was sufficient to support appellants' convictions. Similarly, under the "moving train" theory, knowing participation in any act in furtherance of a conspiracy entails full conspiratorial liability. *See United States v. Rivera–Santiago*, 872 F.2d 1073, 1079 (1st Cir.), *cert. denied*, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989); *United States v. Baines*, 812 F.2d 41, 42 (1st Cir.1987). Thus, the jury was not left free to convict appellants based solely on an "act of juvenile delinquency," but only if it found *post*-majority conduct sufficient to establish beyond a reasonable doubt that appellants participated in the conspiracy alleged in the indictment.

### D. *Sufficiency of the Evidence.*

 "[E]schewing credibility judgments and drawing all reasonable inferences in favor of the verdict," we evaluate the sufficiency of the evidence with a view to whether the verdict "draws its essence from a plausible reading of the record" and whether the jury rationally could have determined that the government established every element of the charged offense beyond a reasonable doubt. *Sepulveda*, [15 F.3d at 1173]; *see United States v. Clifford*, 979 F.2d 896, 897 (1st Cir.1992) ("'Nor does the government have to disprove every reasonable hypothesis of innocence.'") (citation omitted). Appellants question the sufficiency of the evidence on but one element of the offense— their voluntary or "meaningful" post-majority participation in the conspiracy. We find no shortfall.

No less than five witnesses testified to overt conduct by Driesse from which the jury reasonably could have found direct participation in the Sepulveda conspiracy following his eighteenth birthday on April 6, 1988. In the "summer of 1988," Driesse delivered an ounce of cocaine to the residence of John Rice; after Rice complained to Edgar Sepulveda that the cocaine Driesse had delivered was underweight, Driesse collected $1150 from Rice. Daniel Santos accompa-

---

**13.** Juries commonly are called upon to make similar distinctions in determining the criminal liability of codefendants as accessories, a task which requires findings both as to the underlying offense and the codefendants' association with the principal. *See, e.g., United States v. Ortiz*, 966 F.2d 707, 711–12 (1st Cir.1992) (collecting cases), *cert. denied*, —— U.S. ——, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993).

nied Driesse and the Sepulvedas on a drug run to Massachusetts in the "summer of 1988," at the culmination of which Driesse "threw [Santos] the coke." Driesse later admitted to Rice that he had made another drug run to Massachusetts with codefendant Ernest Langlois in late 1988 or early 1989. Moreover, Randall Vetrone and Norberto Perez bought cocaine from Driesse several times a week throughout 1989. Finally, in April 1989, David Sepulveda referred Kurt Coriarty to Driesse as a source of cocaine.

■■■ Four witnesses testified to overt conduct by Shane Welch from which the jury reasonably could have inferred participation in the conspiracy following his eighteenth birthday on November 20, 1989. In late 1989 and early 1990, Santos, Vetrone and Rice purchased cocaine from Welch, usually at Edgar Sepulveda's residence, and on some occasions Welch himself conducted these transactions. On March 6, 1990, Welch accompanied Santos and the Sepulveda brothers on a drug run to Massachusetts for the *announced* purpose of replenishing the Sepulvedas' cocaine inventory. During this run, when he discovered they were under surveillance by local police, Welch warned

Santos. Detective Vallante arrested Welch after he stopped Santos's car, and the cocaine was seized.[14] Following his return to New Hampshire, Welch also served as a fledgling "enforcer" for Sepulveda, at one time attempting to break down the door at the Vetrone residence.

The only attack appellants mount against all this evidence is that it is incredible, a challenge foreclosed by the jury's credibility determination. *See United States v. David,* 940 F.2d 722, 730 (1st Cir.1991). Thus, there was ample evidence of post-majority participation to overcome appellants' "mere bystander" defenses.

## II. *Claims Made Exclusively by Driesse.*[15]

### A. *Coconspirator Statements.*

Driesse claims that the district court committed reversible error by allowing the government to introduce, over timely objection, an inadmissible hearsay statement. James Noe testified that he was told by Robert Labrecque, Driesse's cousin, that Labrecque was selling cocaine *for Driesse* in late 1988 and early 1989; that is, *after* Driesse reached age eighteen. No reason was assigned for

---

**14.** Shane Welch raises one separate issue. Pointing to his March 1990 state court conviction in Massachusetts for cocaine possession, criminal conduct which the federal indictment alleges as an overt act by Welch in furtherance of the Sepulveda conspiracy, Welch argues that the federal prosecution was barred by the Double Jeopardy Clause of the United States Constitution. As primary authority, he cites *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), in which the Supreme Court stated that double jeopardy bars a subsequent prosecution "if, to establish an essential element of an offense charged in that prosecution, [the government] will prove *conduct* that constitutes an offense for which the defendant has already been prosecuted." *Id.* at 510, 110 S.Ct. at 2087 (emphasis added).

Welch's argument fails for at least two reasons. First, it seems entirely possible that *Grady,* which involved two successive *state* prosecutions, was not intended to override the longstanding "dual sovereign" doctrine, which holds that successive prosecutions by federal and state governments normally do not implicate the Double Jeopardy Clause. *See Heath v. Alabama,* 474 U.S. 82, 92–93, 106 S.Ct. 433, 439–40, 88 L.Ed.2d 387 (1985) ("[A] single act constitutes an 'offense' against each sovereign whose laws are violated by that

act."). Second, the Supreme Court mooted the entire matter in *United States v. Felix,* —— U.S. ——, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992). "[L]ong antedating [*Grady*], and not questioned in [*Grady*] is the rule that a substantive crime, and a conspiracy to commit that crime, are not the 'same offense' for double jeopardy purposes," so that "prosecution ... for conspiracy, where certain of the overt acts relied upon ... are based on substantive offenses for which the defendant has been previously convicted, does not violate the [Double Jeopardy] Clause." *Id.* —— U.S. at ——, 112 S.Ct. at 1380, 1384. Indeed, prior to *Felix,* we gave *Grady* the same gloss. *See United States v. Rivera–Feliciano,* 930 F.2d 951, 954–55 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1676, 118 L.Ed.2d 394 and *cert. denied,* —— U.S. ——, 113 S.Ct. 221, 121 L.Ed.2d 159 (1992). One year after *Felix,* the Supreme Court explicitly overruled *Grady. United States v. Dixon,* —— U.S. ——, ——, 113 S.Ct. 2849, 2860, 125 L.Ed.2d 556 (1993).

**15.** We need not discuss certain other contentions Driesse raised in common with his codefendants, the merits of which were considered in *Sepulveda* [, 15 F.3d at 1191], including his challenges to the bill of particulars, *see id.* at 1192, and the government's closing arguments, *see id.* 15 F.3d 1161, 1185–89.

admitting the hearsay statement over the Driesse objection. Moreover, Driesse contends that the government failed to prove by a preponderance of the evidence that Labrecque was a "coconspirator," Fed.R.Evid. 801(d)(2)(E), whose statement would have been admissible if made "in furtherance of the conspiracy."

■■■■ "[A] [putative] coconspirator's statement, *standing alone,* is insufficient to meet the preponderance standard of Rule 801(d)(2)(E)"; the proponent of the statement must submit some extrinsic evidence of the declarant's involvement in the conspiracy. *Sepulveda,* [15 F.3d at 1181–82]. There is no such extrinsic evidence in the record. Labrecque's statement was the *sole* source of Noe's knowledge about Labrecque's complicity. Beyond that, Noe simply testified that Driesse and Labrecque were "cousins," who lived in the same apartment project, and that Noe had observed Labrecque "with" Driesse on previous occasions. *See United States v. Gomez,* 921 F.2d 378, 381 (1st Cir.1991) (mere "association" does not establish conspiratorial involvement). Although Noe sold cocaine *to* Labrecque for Labrecque's "use, not for [re]selling," Noe never observed Labrecque selling drugs, let alone doing so in Driesse's company, or "for" Driesse. Although the government argues that the trial court was permitted to conclude that it was "more likely than not" that Labrecque was an "unindicted coconspirator," except for the hearsay statement itself there was no evidentiary basis, only conjecture, to support such an inference.

■■■■ Although admission of Noe's hearsay statement was error, we conclude that the error was harmless. *See* Fed. R.Crim.P. 52(a). No less than five other witnesses offered unequivocal testimony with respect to Driesse's active involvement in the conspiracy. *See supra* Section I.D. Thus, the Labrecque hearsay statement was merely cumulative, and had no significant effect on the verdict. *See United States v. Dworken,* 855 F.2d 12, 26 (1st Cir.1988).[16]

### B. *"Missing Witness" Instruction.*

■■■■ Driesse contends that he was entitled to a "missing witness" instruction, which would have permitted the jury to infer, from " 'the failure of a party to produce available evidence that would help decide an issue, ... that the [missing] evidence would [have been] unfavorable to the party to whom it is available or whom it would normally be expected to favor.' " *United States v. St. Michael's Credit Union,* 880 F.2d 579, 597 (1st Cir. 1989) (citation omitted). As the proponent of such an instruction, Driesse was required to show that the absent witness (Labrecque) would have been (1) "favorably disposed" to testify in the government's behalf by virtue of his status or relationship to the parties, (2) "peculiarly available" to the government, *or* (3) within the government's "exclusive control." *Id.* Driesse asserted that Labrecque could more easily have been located by the government since he was under the probationary supervision of the New Hampshire Department of Corrections.

■■■■ We review the refusal to give a "missing witness" instruction for abuse of discretion. *United States v. Arias–Santana,* 964 F.2d 1262, 1268 (1st Cir.1992). Given the available evidence that Driesse and Labrecque were family members who had resid-

---

**16.** Driesse asserts that the government laid an evidentiary "trap" for the unwary defense team, when it elicited testimony from Randall Vetrone on direct examination that he had purchased stolen property previously. The government did not go on to inquire into the identity of Vetrone's source. On cross-examination by counsel for one of Driesse's codefendants, Vetrone testified that he had bought the pilfered goods from Driesse. Driesse moved for mistrial, contending that the government's "trap" evidenced prosecutorial misconduct, which resulted in the admission of otherwise inadmissible evidence. *See Figueroa,* 976 F.2d at 1453 ("other crime" evidence

generally inadmissible to show bad character or unrelated criminal activity); *United States v. Eatherton,* 519 F.2d 603, 611 (1st Cir.) (same), *cert. denied,* 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975). We find no evidence of prosecutorial misconduct in the government's anticipatory proffer. The government explains that it divulged the evidence of Vetrone's past criminal activity in order to preempt the defense from impeaching Vetrone on cross-examination. Given the reasonableness of its trial tactic, the government cannot be faulted for the seemingly irrelevant follow-up question the defense chose to put to Vetrone.

ed in the same apartment project, Driesse can make no serious claim that Labrecque was naturally predisposed to testify for the government. Moreover, given the familial relationship, the bare fact that Labrecque was a state probationer did not establish that he was *peculiarly* available to the government, let alone unavailable to Driesse. Indeed, the government provided the defense with Labrecque's two last-known addresses, *cf. St. Michael's Credit Union,* 880 F.2d at 598 (upholding denial of instruction where government allegedly knew missing witness's whereabouts during trial), attested that he was not in the government's control, and disavowed any intention (or need) to call Labrecque as a witness.[17] In these circumstances, absent any evidence that Labrecque was not available to his cousin Driesse, or that the government interfered with any effort to locate or produce Labrecque at trial, the district court acted well within its discretion in denying a "missing witness" instruction.

### C. *Sentencing.*

■ Finally, Driesse challenges the drug quantity calculation recommended in the presentence report (PSR) and relied on by the court at sentencing. The PSR calculation was based on the trial testimony of Norberto Perez that Driesse accompanied Perez on "about 20" drug runs between 1987 and 1989, involving from one kilogram to 113.4 grams of cocaine per trip. The PSR assigned an average of 16 ounces per trip, resulting in a total estimate of 9.09 kilos (or 320 oz.).

Thus, Driesse was assigned a base offense level (BOL) of 32 (5–15 kilograms).

■ Where the sentencing court relies *solely* on the rough drug quantity estimates of a lay witness, expressed in terms of a *range,* rote averaging is an insufficiently reliable basis for a supportable drug quantity finding. *Sepulveda,* [15 F.3d at 1196–99]. Unlike the sentences imposed on Driesse's codefendants, Tony Rood and William Wallace, which were based on rough ranging estimates not only of the number of drug runs but the cocaine quantity per trips, the only rough averaging involved in the drug quantity finding for the Driesse sentencing was the wide ranging estimate of the quantity of drugs per trip (4 ozs. to 1 kilogram). Nevertheless, since the lowest estimated quantity range (4 ozs.) per trip would yield a total drug quantity of approximately 2.3 kilograms, dropping Driesse well below BOL 32,[18] we vacate his sentence, and remand for resentencing, in accordance with our decision in *United States v. Sepulveda,* 15 F.3d 1161, 1202 (1st Cir.1993).[19]

*The judgments of conviction entered against Christopher Driesse and Shane Welch are affirmed. The sentence of Christopher Driesse is vacated and case No. 92–1370 is remanded for resentencing in accordance with this opinion.*

---

17. As noted, *see supra* Pt. II.A, Labrecque's testimony, even if favorable to the government, would have been largely cumulative, giving rise to a plausible explanation for the government's decision not to investigate his whereabouts or to call him as a witness. *United States v. Johnson,* 467 F.2d 804, 808 (1st Cir.1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973) ("No [adverse] inference is permissible, however, where the unpresented evidence would be merely cumulative....."); *United States v. Norris,* 873 F.2d 1519, 1522–23 (D.C.Cir.) (trial court may consider all of the circumstances in determining entitlement to "missing witness" instruction, including whether the government simply bypassed calling the witness because his testimony " 'would likely have been merely cumulative or corroborative' ") (citation omitted),

*cert. denied,* 493 U.S. 835, 110 S.Ct. 113, 107 L.Ed.2d 75 (1989). Were it not for this commonsense approach, the government could be held presumptively responsible for failing to call any person who *might* have been able to provide relevant testimony, even though the evidence was presented through some other witness.

18. Driesse was assigned an additional 1.146 kilograms apart from the Perez testimony. In any event, even with this additional amount, the total drug quantity would be 3.446, well below the 5 kilogram threshold for BOL 32.

19. All other arguments raised by these appellants are either dealt with by reference in *Sepulveda,* 15 F.3d 1161 (1st Cir.1993) or plainly meritless.