Carol A. **STEINHILBER**, R. Theodore Steinhilber, Eric R. Steinhilber and Heidi A. Steinhilber, PPA R. Theodore Steinhilber as her Father and Next Best Friend, Plaintiffs,

v.

James A. **McCARTHY**, M.D., Defendant.

No. Civ.A. 95–11078–MBB.

United States District Court, D. Massachusetts.

Nov. 3, 1998.

Frederic N. Halstrom, Halstrom Law Offices, Boston, MA, for plaintiffs.

Nancy L. Watson, Ficksman & Conley, Boston, MA, for defendant.

## ORDER RE: PLAINTIFFS' RULE 59 MOTION FOR A NEW TRIAL ON ALL ISSUES (DOCKET ENTRY # 80)

BOWLER, United States Magistrate Judge.

On April 17, 1998, this court entered a final judgment in the above styled medical malpractice case. Thereafter, plaintiffs Carol A. Steinhilber ("Carol Steinhilber"), R. Theodore Steinhilber ("Theodore Steinhilber"), Eric R. Steinhilber ("Eric Steinhilber") and Heidi A. Steinhilber ("Heidi Steinhilber") (collectively: "plaintiffs") filed a timely motion for a new trial under Rule 59(a) ("Rule 59"), Fed.R.Civ.P.[1] (Docket Entry # 80). Defendant James A. McCarthy, M.D. ("Dr.McCarthy") opposes the motion. (Docket Entry # 81).

### PROCEDURAL BACKGROUND

Plaintiffs' five count, second amended complaint raises a claim of negligence and a claim of lack of informed consent, both brought by Carol Steinhilber. The remaining three claims, each separately brought by Theodore, Eric and Heidi Steinhilber, are for loss of consortium due to the negligence of Dr. McCarthy. After hearing six days of testimony, this court instructed the jury on the negligence, lack of informed consent and loss of consortium claims.

In answer to the special verdict questions, the jury found that Carol Steinhilber failed to meet her burden of proving: (1) that Dr. McCarthy was negligent; and (2) that Dr. McCarthy breached a duty to inform her of the significant risks, consequences and options in connection with her medical treatment. In light of the jury's findings and because the loss of consortium claims required "proof of a tortuous act that caused the claimant's spouse or parent ... personal injury," Suarez v. Belli, 1997 WL 39918 at *3 (Mass.Super.Ct. Jan. 13, 1997) (quoting Sena v. Commonwealth, 417 Mass. 250, 629 N.E.2d 986 (Mass.1994); internal quotation marks and brackets omitted), this court entered a final judgment in favor of Dr. McCarthy on April 17, 1998.[2]

Plaintiffs seek a new trial for three reasons. First, they contend that the verdict is against the clear weight of the evidence because "the jury found no breech (sic) from the standard of care and no breech (sic) of the duty regarding informed consent." [3]

Second, they argue that they were prejudiced because of this court's refusal to allow them to argue to the jury the absence of certain witnesses at trial. They also contend that the jury instructions were deficient insofar as they omitted an instruction allowing the jury to infer that the testimony of these missing witnesses would have been unfavorable to Dr. McCarthy.

---

1. Plaintiffs' three sentence motion, with three, previously filed, proposed instructions attached, contravenes LR. 7.1(b)(1). This rule requires the party filing a motion to also file a memorandum of reasons.

2. Although loss of consortium claims are independent of the claim of the injured spouse or parent, see Olsen v. Bell Telephone Laboratories, Inc., 388 Mass. 171, 445 N.E.2d 609, 612 (Mass. 1983) (recognizing independence of consortium claim vis-a-vis non-injured spouse), a prerequisite for such claims "is that the injured spouse have a valid claim." Armstrong v. Lamy, 938 F.Supp. 1018, 1046 (D.Mass.1996) (spouse's consortium claim requires proof of tortuous act causing injury to other spouse); Suarez v. Belli, 1997 WL 39918 at *3 (Mass.Super.Ct. Jan. 13, 1997) (child's loss of consortium claim must be based on parent's personal injury). In light of the jury's findings that Dr. McCarthy was neither negligent nor liable due to lack of informed consent, neither Theodore, Eric, nor Heidi Steinhilber may recover for loss of consortium. See, e.g., Vasquez v. Community Savings Bank, 1995 WL 808709 at *2 (Mass.Super.Ct. April 11, 1995) (summary judgment on injured parent and spouse's claims required dismissal of spouse's and son's loss of consortium claims). Plaintiffs do not challenge the entry of final judgment on the loss of consortium claims except by implication inasmuch as they argue that the jury's verdict as to Carol Steinhilber's negligence and lack of informed consent claims are against the clear weight of the credible evidence.

3. Plaintiffs provide no supporting arguments for these contentions.

Third, plaintiffs object to this court's instruction with respect to expert testimony. Claiming that the instruction was deficient, plaintiffs proposed two instructions requiring the jury to disbelieve the testimony of Dr. McCarthy's two expert witnesses if they credited the testimony of Carol Steinhilber concerning her complaints to Dr. McCarthy. This court addresses these arguments *seriatim* after providing a general synopsis of the evidence for context and background purposes.

## FACTUAL BACKGROUND

In June 1991 Carol Steinhilber, a 45 year old woman at the time, had her initial visit with Dr. McCarthy. Prior thereto, she had been seeing a chiropractor for approximately two years. Dr. McCarthy is a board certified neurologist with a practice in Hyannis, Massachusetts.

While the evidence presents conflicting versions of events, it includes the following.[4] According to Dr. McCarthy's testimony and office notes, the initial visit lasted approximately one hour. At the time, Carol Steinhilber complained of headaches and neck pain. Dr. McCarthy's records note that, "She dates the onset of her problem to an accident while vacationing in Hawaii in November of 1987." After reviewing x-rays supplied by Carol Steinhilber and conducting an examination, Dr. McCarthy assessed her condition as a chronic cervical sprain and superimposed tension coupled with a finding of being somewhat depressed. He prescribed Elavil at a dosage of 25 milligrams per day[5] and set a follow-up visit for one month later.

Dr. McCarthy saw Carol Steinhilber again, together with her husband, in July 1991. She complained of vomiting, possibly related to the Elavil. He prescribed Robaxin, a muscle relaxant, inasmuch as she continued experiencing a chronic cervical sprain.

During the August 1991 visit, she described morning headaches which wore off as the day progressed, according to Dr. McCarthy's notes and testimony. Dr. McCarthy saw Carol Steinhilber again in October and in December 1991. He prescribed physical therapy for her in December and, as noted during her January 1992 visit, the physical therapy was "helping some."

The next office visit took place on March 26, 1992, at which time Dr. McCarthy described Carol Steinhilber as quite depressed. He noted that the physical therapy "helps to some degree but it is only temporary." Dr. McCarthy prescribed a trial of Prozac and noted that she continued to have persistent neck pain. He did not observe a change in her gait at that time, according to his testimony. Nor, according to Dr. McCarthy, did Carol Steinhilber report a change in her vision or her gait during the March 26, 1992 visit.

Dr. McCarthy next saw Carol Steinhilber for an appointment in late April 1992. According to his handwritten notes, she continued to experience headaches. He discontinued the Prozac because of sleeping difficulties and prescribed another course of Elavil at the 25 milligram dosage.

According to Dr. McCarthy's testimony, he initially observed an unsteady gait and slight ataxia during the May 28, 1992 visit. He also described her headaches as more severe and frequent at that time. He testified that during the May 28, 1992 visit he performed a funduscopic examination and observed abnormal venus pulsations in one eye as well as swelling of the optic nerve. Dr. McCarthy's partner, Dr. William F. Johnson ("Dr.Johnson"), also saw something "a little bit funny" upon viewing Carol Steinhilber's eyes, according to Dr. McCarthy.

---

**4.** The evidence is summarized initially primarily from the vantage point of Dr. McCarthy and thereafter primarily from the vantage point of plaintiffs. Additional facts relevant to plaintiffs' arguments vis-a-vis the weight of the evidence, the missing witnesses and the instruction as to expert testimony are set forth under the Roman numeral heading pertaining to the argument.

**5.** Andrew Harry Leader–Cramer, M.D. ("Dr.Leader–Cramer"), an expert called by Dr. McCarthy, testified that a 25 milligram dosage of Elavil is prescribed for pain problems. Patients with depression generally need daily doses of Elavil in the range of 100 to 150 milligrams, according to Dr. Leader–Cramer. Dr. McCarthy prescribed Elavil again to Carol Steinhilber in April 1992.

Dr. McCarthy's notes indicate that he planned to set up an MRI due to these findings.[6] His handwritten notes read, in pertinent part, as follows: "Plan—will get MRI." Similarly, his typewritten notes state that, "[b]ecause of these finding[s,] the MRI has been set up for tomorrow."

Records dated May 29, 1992, from Cape Cod Hospital in Hyannis detail Carol Steinhilber's medical history and the findings of a physical examination, presumably conducted by Dr. Albert N. Martins ("Dr.Martins"), the neurosurgeon who performed the subsequent operation. These records describe Carol Steinhilber's symptoms as neck pain and headaches for a number of years, "nausea and vomiting of one month duration" and that, "[m]ore recently, she has developed slurred speech and imbalance of gait." The findings of the May 29, 1992 physical examination reflected in these records also show "[n]o obvious ataxia" and "bilateral papilledema."

On May 29, 1992, Carol Steinhilber underwent an MRI of her brain at Cape Cod Hospital. The MRI revealed a large mass in the right posterior fossa of her brain most likely representing a meningioma which required immediate removal.[7] On May 30, 1992, Dr. Martins surgically removed the meningioma.[8] Notwithstanding the surgery, Carol Steinhilber presently suffers a vision field deficit in addition to other problems.

Plaintiffs believe that Dr. McCarthy's delay in ordering the MRI and in uncovering the meningioma as the source of her problems was negligent and proximately caused her vision problems. According to plaintiffs, if Dr. McCarthy had ordered the MRI at an earlier date the meningioma would have been removed at a time when it was smaller and, accordingly, Carol Steinhilber would not be experiencing the resulting vision field deficit.

As noted above, the record is conflicting inasmuch as Carol and Theodore Steinhilber's testimony presents, at times, a different version of events. They testified that Carol Steinhilber kept notes of her symptoms. Carol Steinhilber testified that she brought her notes listing her problems with her to each meeting with Dr. McCarthy. She also testified that during the June 1991 initial visit Dr. McCarthy did not take her blood pressure, listen to her pulse or perform any labwork. After the first visit when Dr. McCarthy tested her muscle strength, extension and looked into her eyes, she testified that he never repeated this type of examination until her last visit. Instead, subsequent visits often involved talking about the local real estate market, according to Carol Steinhilber. Dr. McCarthy's medical records for the first visit note that, "This patient has been under a considerable amount of stress over the past few years since she is in the real estate business."

During the August 1991 visit, she testified that she asked Dr. McCarthy for an MRI but he told her that she did not need the test and proceeded to talk about the economy and the local bank problems.[9] She further testified that Dr. McCarthy attributed her symptoms to depression and stress at the October 1991 visit.

In or around January 1992 she began experiencing difficulty with her vision and had an incident driving which required her to pull to the side of the road, according to her testimony. By March 1992, she stated that she noticed a balance problem and she recalls telling Dr. McCarthy about her gait. Carol Steinhilber also testified that at the time of the March 1992 visit her symptoms included continuing problems with her vision and feeling sick every day.[10] She described her

6. Likewise, Dr. McCarthy testified that he made arrangements for the MRI after conducting the funduscopic examination of Carol Steinhilber's eyes. An MRI is an acronym for magnetic reasoning imaging.

7. As explained by Dr. Leader–Cramer, a meningioma is a benign intracranial tumor.

8. Carol Steinhilber signed a Cape Cod Hospital form consenting to the surgery and acknowl-

edging her awareness of the risks and consequences of such surgery.

9. Dr. Leader–Cramer testified that an MRI was not indicated during this time period.

10. In contrast and without summarizing the entire record, which this court has fully reviewed and considered, there is convincing evidence that Carol Steinhilber did not present a change in her gait, vision or a marked increase in the severity

speech as becoming more deliberate in the spring of 1992. Theodore Steinhilber similarly noted that his wife's speech gradually changed and became slower during her treatment with Dr. McCarthy. With respect to the April 1992 visit, which occurred slightly more than one month prior to her surgery, she stated that Dr. McCarthy repeated his belief that she was depressed, prescribed another antidepressant, Elavil, and talked about the economy.

According to Carol Steinhilber, she telephoned Dr. McCarthy's office on May 11, 1992, to advise him that she was sick every day and needed something other than the Elavil, which he had already prescribed for her in June 1991. She stated that Dr. McCarthy simply advised her to take Advil. After another telephone call, Dr. McCarthy prescribed Fiorinal which, according to Dr. Leader–Cramer, is an effective medication to treat tension headaches and mild migraine headaches.

Carol Steinhilber also testified that she telephoned Dr. McCarthy on Friday May 15, 1992, spoke with Dr. McCarthy and said that she wanted an MRI. Dr. McCarthy agreed that he would order the test, according to Carol Steinhilber. When either Carol or Theodore Steinhilber telephoned Dr. McCarthy's office a few days later, they discovered that the test had not been ordered. After repeating their request for an MRI, the office telephoned them shortly thereafter to advise them that the MRI had been scheduled for May 29, 1992.

At the May 28, 1992 visit, Carol Steinhilber testified that both Dr. McCarthy and Dr. Johnson examined her eyes. She and Dr. McCarthy also discussed the upcoming MRI test.

As previously stated, the May 29, 1992 MRI revealed a mass with the typical appearance of a meningioma. On May 30, 1992, Dr. Martins surgically removed the meningioma. Medical records repeatedly describe the size of the meningioma as "massive." Notwithstanding the surgery, she presently experiences a vision field deficit and other problems.

of her headaches to Dr. McCarthy until the May

## I. VERDICT AGAINST THE WEIGHT OF THE EVIDENCE

Plaintiffs attack the jury's verdict that there was no breach of the standard of care and that there was no breach of the duty to provide informed consent. In moving for a new trial on the basis that the verdict is against the weight of the evidence, plaintiffs face a difficult hurdle.

A motion for a new trial under Rule 59 requires a finding that "the verdict is so seriously mistaken, so clearly against the law or evidence, as to constitute a miscarriage of justice." *Transamerica Premier Insurance Company v. Ober,* 107 F.3d 925, 929 (1st Cir.1997) (internal quotation marks omitted); *accord Colasanto v. Life Insurance Company of North America,* 100 F.3d 203, 212 (1st Cir.1996); *Sanchez v. Puerto Rico Oil Company,* 37 F.3d 712, 717 (1st Cir.1994) (court will set aside jury verdict only if it "is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice"). "This strict standard of review is especially appropriate if the motion for new trial is based on a claim that the verdict is against the weight of the evidence." *Transamerica Premier Insurance Company v. Ober,* 107 F.3d at 929 (internal quotation marks omitted).

Although the court can weigh the evidence and assess the credibility of various witnesses, "a jury verdict that is supported by the evidence may not be set aside simply because the trial judge would have reached a different result." *Data General Corporation v. Grumman Systems Support Corporation,* 825 F.Supp. 340, 348 (D.Mass.1993), *aff'g in part and remanded in part on other grounds,* 36 F.3d 1147 (1st Cir.1994); *Insurance Company of North America v. Musa,* 785 F.2d 370, 375 (1st Cir.1986) ("[i]n considering a new trial motion, the court may weigh the evidence and assess the credibility of witnesses"). Consequently, although this court does not agree with the jury's verdict, this court cannot "act merely as a '13th juror' and set aside a verdict simply because [it] would have reached a different result had [it]

28, 1992 visit.

been the trier of fact." *Payton v. Abbott Labs,* 780 F.2d 147, 153 (1st Cir.1985).

Plaintiffs first assert that the jury's finding as to negligence, i.e., that Dr. McCarthy breached the relevant standard of care, was against the weight of the evidence. The special verdict questions separated the finding of negligence from the finding of causation. Thus, in answering "No" to the negligence special verdict question in the context of the general charge, the jury found that Carol Steinhilber did not meet her burden of proving that Dr. McCarthy failed to adhere to the standard of care and skill of the average member of his profession practicing the specialty of neurology from June 1991 to May 1992.

Under Massachusetts law, "A physician is held to the standard of care and skill of the average practitioner of the medical specialty in question, taking into account the advances in the profession." *Mitchell v. United States,* 141 F.3d 8, 13 (1st Cir.1998); *accord Stepakoff v. Kantar,* 393 Mass. 836, 473 N.E.2d 1131, 1134 (Mass.1985) (negligence of physician practicing specialty "consists of a failure to exercise the degree of care and skill of the average qualified physician practicing that specialty, taking into account the advances in the profession and the resources available to the physician"). Typically, a plaintiff meets her burden of proof on the issue of negligence "only with the assistance of expert testimony." *Mitchell v. United States,* 141 F.3d at 13.

This court therefore turns to the testimony of Dr. McCarthy's expert on the issue of the appropriate standard of care, Dr. Leader–Cramer. Dr. Leader–Cramer is a board certified neurologist, a member of the American Academy of Neurology and licensed to practice neurology in Massachusetts, New York and the United Kingdom. For more than 15 years, he has been a consulting neurologist in adult neurology in the North Shore area of Boston. He is an attending physician at hospitals in Salem and in Lynn, Massachusetts. He also teaches neurology to medical residents at Salem Hospital in Salem.

With respect to Dr. McCarthy's records and note keeping, Dr. Leader–Cramer opined to a reasonable degree of medical certainty that Dr. McCarthy's records were adequate for a neurologist in active office practice. He also opined to a reasonable degree of medical certainty that Dr. McCarthy's records were consistent with accepted practices and the standard of care as reflected in the Practice Parameters of the American Academy of Neurology.

Dr. Leader–Cramer also testified that in his experience neither headaches nor neck pain was consistent with or suggestive of an underlying meningioma. According to Dr. Leader–Cramer, headaches may result from exposure to different chemicals, ear problems, neck problems, bleeding or a stroke. He noted that although a meningioma does not provide any particular set of symptoms, at times, a meningioma will produce symptoms suggestive of an abnormality in the brain. He elaborated that such symptoms may include difficulty with speech, memory or vision, numbness, tingling and difficulty with muscle strength, particularly on one side of the body.[11]

Normally, a neurologist, when faced with a patient complaining of headaches, will try medication to alleviate the problem rather than order a battery of tests, according to Dr. Leader–Cramer. He also noted that headaches of a long duration are less ominous than headaches of a new or sudden onset.

Dr. Leader–Cramer opined to a reasonable degree of medical certainty that the examination performed by Dr. McCarthy in June 1991, when Carol Steinhilber first visited him, was consistent with the standard of care of the average neurologist in 1991. He further opined to a reasonable degree of medical certainty that, assuming Dr. McCarthy's clinical impression in June 1991 was a chronic cervical sprain and superimposed tension, that such an impression was consistent with the history and the physical examination. Moreover, he testified to a reasonable degree of medical certainty that good neurological

---

11. On the other hand, he also stated that headaches may sometimes result from brain tumors.

practice did not require MRI testing at that time.[12]

Assuming that Carol Steinhilber returned to visit Dr. McCarthy in July and August 1991, Dr. Leader–Cramer opined to a reasonable degree of medical certainty that there was no indication that Carol Steinhilber required an MRI or a CAT scan.[13] He testified that in determining whether to order an MRI or a CAT scan an average neurologist looks for symptoms such as a sudden increase in the severity of headaches, numbness, weakness or unsteadiness.

Assuming that Dr. McCarthy prescribed Prozac to Carol Steinhilber in March 1992, as factually supported in the record, Dr. Leader–Cramer opined that it was an appropriate next step. Finally, he testified, based on the assumption that Dr. McCarthy prescribed Fiorinal to Carol Steinhilber in or around May 11, 1992,[14] that Fiorinal was "a very good medication to give someone having intermittent headaches" and is "extremely effective in treating tension type headaches." In sum, Dr. Leader–Cramer opined to a reasonable degree of medical certainty, that the medications prescribed by Dr. McCarthy for Carol Steinhilber were appropriate under the circumstances of each visit.

In addition, Dr. Leader–Cramer opined that it was consistent with good medical practice for Dr. McCarthy to order an MRI for Carol Steinhilber based on the physical findings and history obtained on May 28, 1992. He opined that no scan was indicated by her symptoms and findings prior to May 28, 1992. Based on his review of the MRI films and the MRI report, he additionally opined to a reasonable degree of medical certainty that Carol Steinhilber had not been experiencing papilledema for a long period of time prior to May 28, 1992. Assuming, as reflected in the medical record, that Dr. Martins documented full visual fields on May 29, 1992,[15] Dr. Leader–Cramer also opined to a reasonable degree of medical certainty that there was no evidence in the record that Carol Steinhilber had a visual field problem prior to the surgery.[16]

On direct examination, he gave an opinion, based on his review of the medical records and the deposition testimony, that Dr. McCarthy's treatment of Carol Steinhilber from June 1991 to May 1992 complied with the standard of care of an average neurologist at that time. Finally, he opined to a reasonable degree of medical certainty that nothing that Dr. McCarthy did during his treatment of Carol Steinhilber had anything to do with her visual field deficit.

On cross examination, plaintiffs' counsel pointed out various discrepancies and undermined the foundation for a number of Dr. Leader–Cramer's opinions.[17] During his direct examination, Dr. Leader–Cramer testified that, prior to his testimony, he had reviewed the medical records, including the chiropractic records, the Cape Cod Hospital records, Dr. McCarthy's records, opthamology records after Carol Steinhilber's discharge from Cape Cod Hospital, the depositions of the parties, including those given by

12. He also noted that the 25 milligram dose of Elavil prescribed by Dr. McCarthy in June 1991 was appropriate to relieve pain as opposed to depression. He also stated to a reasonable degree of medical certainty that Robaxin, a muscle relaxant prescribed by Dr. McCarthy in the summer of 1991, was a good drug to try on a patient experiencing muscle spasms in the neck.

13. A CAT scan is an acronym for a computer assisted tomography scan.

14. This assumption is also supported by facts in the record.

15. The May 29, 1992 report states, in pertinent part, that, "Visual fields are full to confrontation."

16. Dr. Leader–Cramer also opined on the issue of causation, which is not directly material to the present motion, that to a reasonable degree of medical certainty Carol Steinhilber's visual field deficit resulted from an injury to the brain during surgery. In addition, he opined to a reasonable degree of medical certainty that if the surgery had been performed three, six or even 12 months prior to the May 30, 1992 actual surgery date that Carol Steinhilber's visual deficit would not have been any different. On cross examination, however, Dr. Leader–Cramer agreed that there is more risk in removing a larger meningioma.

17. These discrepancies are also detailed in Roman numeral III with respect to the denial of plaintiffs' proposed instruction on expert testimony.

Carol and Theodore Steinhilber and Dr. McCarthy, and the interrogatories. On cross examination, however, he testified that he based his testimony on what was recorded in Dr. McCarthy's notes and that he had no knowledge of what Carol Steinhilber said or did not say.[18] He also acknowledged that Carol Steinhilber's deposition testimony contains testimony that she was the person who requested the MRI in the middle of May 1992. On cross examination, he also testified that good medical practice would require a neurologist, who received a history from a patient of the visual problems testified to by Carol Steinhilber in January 1992, to determine the cause of the visual problem. Finally, he agreed that it would not make a difference in his opinion if Carol Steinhilber discontinued Elavil in June 1991 as opposed to March 1992.

These discrepancies, as well as others in the record, however, do not establish that the verdict is against the weight of the evidence. Having reviewed Carol Steinhilber's deposition as well as the medical records, Dr. Leader–Cramer determined that her deposition testimony as to her complaints was not corroborated with contemporaneous records and rendered his opinions accordingly. His testimony was credible and based upon sufficient facts or data.[19] It provides more than adequate evidence that Dr. McCarthy adhered to the standard of care of an average neurologist during the relevant time period. In other words, the jury's verdict that Carol Steinhilber failed in her burden of establishing that Dr. McCarthy was negligent is not against the demonstrable weight of the credible evidence.[20] To the extent plaintiffs challenge the jury's verdict on the standard of care, their argument is unavailing.

■ Plaintiffs also contend that the jury's verdict on informed consent is against the clear weight of the credible evidence. The special verdict questions separated the finding of breach of the duty to provide informed consent from the finding of causation. Thus, in answering "No" to the informed consent special verdict question, the jury found that Carol Steinhilber did not meet her burden of proving the existence and breach of a duty owed by Dr. McCarthy to inform her of the significant risks, consequences, and options for medical treatment.

■ The language in the special verdict question corresponds with language in *Kissinger v. Lofgren*, 836 F.2d 678, 680 (1st Cir.1988). As noted by the First Circuit in *Kissinger*, "The doctrine of informed consent

18. Because this exchange and others are also relevant for purposes of analyzing plaintiffs' objection to the failure to give plaintiffs' proposed instructions 41 and 42, pertinent excepts from Dr. Leader–Cramer's cross examination testimony include the following:
Q. Is it fair to say, Doctor, that your testimony is based upon what Dr. McCarthy noted in his notes and not what Mrs. Steinhilber says in her testimony at deposition and at trial but which Dr. McCarthy did not note; is that a fair statement?
A. My testimony is based on when (sic) Dr. McCarthy's notes record, yes. What Mrs. McCarthy (sic) did or didn't say I have no knowledge of.
Q. Mrs. Steinhilber.
The Court: Mrs. Steinhilber.
A. Steinhilber . . .
Q. You discount—you don't—therefore, you do not consider in your opinions on the standard of care rendered by Dr. McCarthy what Mrs. Steinhilber reported to him other than what you can glean from the records from Dr. McCarthy; is that correct?
A. That's correct . . .
Q. So your testimony, Doctor, is based only upon what is written in Dr. McCarthy's notes.
A. That is correct.

Q. Not on what Mrs. Steinhilber has testified here or in deposition; correct?
A. That is correct . . .
Q. So when you testify in this case, Doctor, that you were relying upon the depositions, without saying which ones, and which you didn't bring with you, and didn't have when you rendered your opinion back in September of 1997, you are ignoring anything Mrs. Steinhilber has to say was going on; correct? Except as it may be recorded in Dr. McCarthy's notes.
A. That's correct.
Dr. Leader–Cramer also explained, however, that, "All I'm saying is there is nothing contemporaneous with her complaints . . . I don't discount it. But I don't have anything to base it on at the time that she was having the complaint."

19. As discussed in greater detail in Roman Numeral III, Rule 703, F.R.E., allows an expert to base an opinion on facts or data if "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."

20. Nor does the jury's verdict result in a miscarriage of justice.

in Massachusetts requires a plaintiff to establish (1) the existence and breach of a duty owed by the defendant to inform about significant risks, consequences, and options of a medical treatment. . . ." *Kissinger v. Lofgren*, 836 F.2d at 680.

■ As explained to the jury in the general charge, the duty of care element has four principal components. These components "are that (1) there exists a 'sufficiently close' doctor-patient relationship, (2) the information subject to disclosure is known or reasonably should have been known by the doctors, (3) the information is such that the doctors should reasonably recognize that it would be material to the plaintiff's decision whether to forego treatment, and (4) the doctors failed to disclose the material information." *Kissinger v. Lofgren*, 836 F.2d at 680; *accord Halley v. Birbiglia*, 390 Mass. 540, 458 N.E.2d 710, 715 (Mass.1983) (citing same four components).

■ Under the second component, as also explained to the jury in the general charge, "The information a physician reasonably should possess is that information possessed . . . by the average qualified physician practicing that specialty." *Harnish v. Children's Hospital Medical Center*, 387 Mass. 152, 439 N.E.2d 240, 243 (Mass.1982). Ordinarily, what the average qualified specialist knew or reasonably should have known is established with expert testimony. *Harnish v. Children's Hospital Medical Center*, 439 N.E.2d at 243. The expert testimony of Dr. Leader–Cramer, as well as other evidence in the record, sufficiently demonstrates that the verdict was not against the weight of the evidence.

Carol Steinhilber's informed consent claim was based on Dr. McCarthy's failure to disclose the risks in the course of treatment that he chose for her. In particular, Dr. McCarthy purportedly did not disclose the material risk of having her proceed with his course of treatment without undergoing an MRI which, the evidence showed, would have uncovered the meningioma prior to May 1992. According to this theory, Dr. McCarthy should have advised and offered an MRI to Carol Steinhilber before May 1992.[21]

Carol Steinhilber's informed consent claim is novel in the sense that the majority of informed consent cases in Massachusetts involve the failure to disclose material risks inherent with a surgical procedure or other form of bodily invasion. *See Feeley v. Baer*, 424 Mass. 875, 679 N.E.2d 180, 182–184 (Mass.1997) (concurring opinion of Justices O'Connor and Lynch discussing and limiting doctrine to cases involving bodily invasion while noting that, "All of our prior cases involving this theory have involved a bodily invasion"); *see, e.g., Aceto v. Dougherty*, 415 Mass. 654, 615 N.E.2d 188, 189 (Mass.1993) (failure to inform patient of risks of performing colonoscopy); *Precourt v. Frederick*, 395 Mass. 689, 481 N.E.2d 1144, 1146 (Mass.1985) (failure to inform patient of side effects of taking Prednisone); *Halley v. Birbiglia*, 458 N.E.2d at 712 (failure to inform patient of risks of performing arteriogram); *Harnish v. Children's Hospital Medical Center*, 387 Mass. at 153, 439 N.E.2d 240 (failure to inform patient of risk of loss of tongue function prior to surgery); *Schroeder v. Lawrence*, 372 Mass. 1, 359 N.E.2d 1301, 1301 (Mass.1977) (operation to remove nontoxic tumor on thyroid gland); *McMahon v. Finlayson*, 36 Mass.App.Ct. 371, 632 N.E.2d 410, 411 (Mass.App.Ct.1994) (failure to inform of risks of laparoscopic examination); *Kissinger v. Lofgren*, 836 F.2d at 679 (failure to advise patient of risks of performing operation);

---

**21.** Proposed instructions 30, 34 and 36 filed on April 14, 1998, set forth the above version of the informed consent claim. In open court on April 16, 1998, plaintiffs' counsel described a slightly different version of the informed consent claim which this court has also considered in the course of denying plaintiffs' motion for a new trial. This variation posits, as explained by plaintiffs' counsel on April 16, 1998, that there was no evidence that Dr. McCarthy ever informed Carol Steinhilber that a tumor or a meningioma might be causing her headaches. Plain-

tiffs' counsel argued that a meningioma was not a negligible risk and that the MRI would have uncovered the meningioma in August 1991 when Carol Steinhilber first requested the test. Dr. McCarthy, however, advised Carol Steinhilber that she did not need an MRI without explaining to her that an MRI would reveal a meningioma, according to plaintiffs' counsel. If uncovered in August 1991, Carol Steinhilber would have had the meningioma removed at an earlier date without the resulting visual field deficit.

*Ostergard v. United States,* 677 F.Supp. 1259, 1260 (D.Mass.1987) (failure to inform of risks of surgical operation). Because case law phrases the failure to inform of risks of a medical treatment, however, *see Kissinger v. Lofgren,* 836 F.2d at 680 (informed consent consists, in part, of breach of duty to inform of "options of a medical treatment"); *Harnish v. Children's Hospital Medical Center,* 439 N.E.2d at 243 (materiality is the significance a reasonable person would attach to the risk "in deciding whether to submit or not to submit to surgery or treatment"), this court allowed plaintiffs' theory to proceed to the jury. The jury's verdict and this court's denial of plaintiffs' motion for a new trial foreclose the need to address this issue.

Notwithstanding plaintiffs' allegation to the contrary, the jury's verdict that Carol Steinhilber failed to meet her burden as to the existence and breach of a duty to inform her of the significant risks of her medical treatment is not against the clear weight of the credible evidence.[22] Dr. Leader–Cramer testified that good medical practice by a neurologist includes advising a patient of what he or she is doing. He noted that there is no danger in having an MRI and that a neurologist can order an MRI at any time.

Dr. Leader–Cramer also credibly testified, however, that good medical care does not require a neurologist to tell a patient why he decides not to order a test such as an MRI. In addition, according to Dr. Leader–Cramer, Carol Steinhilber's symptoms did not indicate the need for an MRI prior to May 28, 1992. Because her symptoms did not indicate the need for an MRI there was no corresponding need to advise Carol Steinhilber that an MRI would uncover a meningioma. Rather, there is sufficient, credible evidence to establish that Carol Steinhilber's symptoms of significant neurological changes

indicative of a meningioma were brought to Dr. McCarthy's attention no earlier than May 28, 1992. Dr. Leader–Cramer testified that the papilledema was of short duration and that Carol Steinhilber did not have a visual field problem prior to surgery. He also testified on direct examination that headaches and neck pain were neither consistent with nor suggestive of an underlying meningioma.[23] Dr. Leader–Cramer additionally explained that headaches of a sudden onset suggested a more ominous cause than headaches which had persisted for a number of months or years, i.e., the headaches experienced by Carol Steinhilber since 1987 or 1988.

Similarly, the May 29, 1992 Cape Cod Hospital notes reflecting the history and findings of a physical examination of Carol Steinhilber[24] describe a "marked increase" in Carol Steinhilber's symptoms "for the past month." "More recently," which implies a time period of less than one month, these notes state that she experienced "slurred speech and imbalance of gait."

Accordingly, the jury's finding that Carol Steinhilber failed in her burden of proving the existence and the breach of a duty to inform her, for example, that a tumor could be causing her headaches, is not against the weight of the evidence. Because the evidence supports a finding that her symptoms did not present the risk of a meningioma or tumor until the May 28, 1992 examination, there is no prior duty to inform Carol Steinhilber that a meningioma or tumor can cause headaches. In other words, based on this and other evidence in the record, which this court has considered and reviewed,[25] the jury could find that Carol Steinhilber failed in her burden of proving that Dr. McCarthy failed to disclose medical information which he reasonably should have recognized was material

**22.** Plaintiffs' motion for a new trial sought a new trial with respect to informed consent solely on the basis that the jury's verdict of "no breech (sic) of the duty regarding informed consent is against the clear weight of the credible evidence." (Docket Entry # 80).

**23.** He also noted, however, that headaches may result from something going wrong in the brain such as a stroke, bleeding or a brain tumor.

**24.** As previously indicated, this court assumes that Dr. Martins performed the examination.

**25.** This court has, in addition to other evidence, considered Dr. Leader–Cramer's testimony that a meningioma is not uncommon, exceptionally unusual or a rare occurrence in a 45 year old woman. He also testified that a meningioma can be life threatening.

to Carol Steinhilber's decision as to whether to submit to his proposed treatment.[26] Inasmuch as there was evidence that an MRI was not indicated under the circumstances and that headaches were not consistent with an underlying meningioma until May 28, 1992, there is sufficient credible evidence that Dr. McCarthy did not breach his duty to disclose all significant medical information that he possessed or reasonably should have possessed that was material to Carol Steinhilber's decision. In short, the jury's verdict that Carol Steinhilber failed to prove the existence and breach of a duty to inform about significant risks is not against the demonstrable weight of the credible evidence or, stated otherwise, is not against the clear weight of the evidence.[27]

## II. *JURY INSTRUCTIONS AND CLOSING ARGUMENT AS TO MISSING WITNESSES*

Plaintiffs contend that their counsel should have been allowed to present a missing witness argument to the jury. They also assert

prejudice on the basis of this court's refusal to instruct the jury on the issue of missing witnesses as set forth in plaintiffs' proposed instruction 29.[28]

The witnesses at issue fall into two categories. First, there are two members of Dr. McCarthy's office staff, identified in plaintiffs' proposed instruction 29 as Ellen Jones and Ellen Singleton.[29] According to plaintiffs, these witnesses are employees of Dr. McCarthy who would have testified as to when the MRI was ordered.[30]

The second category consists of Dr. Johnson, Dr. McCarthy's partner and the individual who examined Carol Steinhilber's eyes during the May 28, 1992 visit.[31] The proposed instruction on missing witnesses did not refer to Dr. Johnson. Rather, it referred solely to the missing testimony of Ellen Jones and Ellen Singleton.

As previously stated, this court may allow "a new trial when 'the verdict is against the clear weight of the evidence, is based upon evidence that is false, or resulted from

26. As precisely phrased by the court in *Precourt* in overturning a jury verdict in favor of the plaintiff/patient, "the question is whether the jury properly could have found that the physician failed to disclose to the patient medical information that the physician reasonably should have recognized as material to the patient's decision whether to undergo surgery." *Precourt v. Frederick*, 395 Mass. 689, 481 N.E.2d 1144, 1146 (Mass.1985); *see also Kissinger v. Lofgren*, 836 F.2d at 681 ("information is 'material' when a physician reasonably should recognize it as necessary for his patient to make an informed decision whether to forego proposed treatment"). The doctrine of informed consent also requires the plaintiff "to establish ... the existence and breach of a duty owed by the defendant to inform about significant risks, consequences, and options of a medical treatment." *Kissinger v. Lofgren*, 836 F.2d at 680.

27. Nor did the jury's verdict result in a miscarriage of justice.

28. In the case at bar, plaintiffs filed 23 proposed instructions on April 3, 1998, as directed by this court on March 31, 1998. (Docket Entryè53 & 56). On April 13, 1998, plaintiffs filed three additional proposed instructions. On April 14, 1992, plaintiffs filed 13 additional proposed instructions, including the proposed missing witness instruction and the proposed instructions on expert testimony. Two days later, this court charged the jury.

29. Ellen Jones and Ellen Singleton were employees of Dr. McCarthy during the period of June 1991 through May 29, 1992. These individuals were still employed by Dr. McCarthy in September 1997.

30. As previously summarized, Carol Steinhilber testified that she telephoned Dr. McCarthy on May 15, 1992, and requested an MRI. Either she or her husband telephoned the office a few days later to discover that the test had not been ordered. After requesting the test again, the office advised them by telephone that the MRI was ordered for May 28, 1992. In contrast, Dr. McCarthy testified that he scheduled the MRI after examining Carol Steinhilber on May 28, 1992. According to Dr. McCarthy, because of a cancellation the following day, he managed to schedule the test for May 29, 1992.

31. As previously indicated, Dr. McCarthy testified that he conducted a funduscopic examination of Carol Steinhilber's eyes during the May 28, 1992 visit. During the examination he noticed a slight swelling of the optic nerve as well as abnormal venus pulsations on one side. Dr. McCarthy stated that he then called his partner to see if he could confirm Dr. McCarthy's findings. According to Dr. McCarthy, his partner also thought that her eyes looked "a little but funny."

some trial error and amounts to a clear miscarriage of justice.' " *Insurance Company of North America v. Musa*, 785 F.2d at 375 (quoting *Payton v. Abbott Labs*, 780 F.2d at 152); *see also Putnam Resources v. Pateman*, 757 F.Supp. 157, 161 (D.R.I.1991) (court may allow new trial where "trial error or other factors have caused a clear miscarriage of justice"). "A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions, unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law." *Gafford v. General Electric Company*, 997 F.2d 150, 166 (6th Cir.1993) (internal quotation marks omitted); *Poulin v. Greer*, 18 F.3d 979, 983 n. 3 (1st Cir.1994) (noting, in context of ruling on new trial motion, that the inquiry is to determine "whether the instructions given tend to confuse or mislead the jury with regard to the applicable principles of law"); *BAII Banking Corporation v. UPG, Inc.*, 985 F.2d 685, 696 (2d Cir.1993) ("new trial is warranted if, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law"); *Kelber v. Joint Industry Board of the Electrical Industry*, 27 F.3d 42, 47 (2d Cir. 1994) (new trial warranted because instructions, taken as a whole, were misleading); *see also Environ Products, Inc. v. Furon Company, Inc.*, 1998 WL 221033 at *1 (E.D.Pa. May 1, 1998); *see, e.g., Jerlyn Yacht Sales, Inc. v. Wayne R. Roman Yacht Brokerage*, 950 F.2d 60, 69 (1st Cir.1991) (allowing motion for new trial inasmuch as jury instructions "were fatally deficient").

 In addition, in order to allow a motion for a new trial, errors in jury instructions or in the refusal to allow argument on a particular subject matter must appear "to the court inconsistent with substantial justice." Fed.R.Civ.P. 61. "An erroneous jury instruction necessitates a new trial only if the error could have affected the result of the jury's deliberations." *Allen v. Chance Manufacturing Company, Inc.*, 873 F.2d 465, 469 (1st Cir.1989) (also paraphrasing relevant case law that erroneous instruction must affect " 'essential fairness of the trial' " or have " 'changed the outcome' " or constitute prejudicial error based on the record as a whole); *see also La Plante v. American Honda Motor Company, Inc.*, 27 F.3d 731, 737 (1st Cir.1994). The "central question" in determining harmless error "is whether the court can say with fair assurance that the judgment was not substantially swayed by the error." *Nieves–Villanueva v. Soto–Rivera*, 133 F.3d 92, 102 (1st Cir.1997).

 "In a civil case, the party asserting error bears the burden of demonstrating that the error was harmful, i.e., that it affected that party's substantial rights." *Nieves–Villanueva v. Soto–Rivera*, 133 F.3d at 102 (citing Rule 61, Fed.R.Civ.P.). Plaintiffs therefore bear the burden of establishing that the alleged error in refusing to allow argument on the subject matter of the missing testimony and the refusal to give the missing witness instruction was harmful.

 There is also an additional caveat with respect to erroneous instructions. The harmless error standard embodied in Rule 61, Fed.R .Civ.P., as opposed to the more stringent plain error standard, governs erroneous instructions only where the party properly objects to the instruction in accordance with Rule 51 and Rule 49(a), Fed. R.Civ.P. *Wilson v. Maritime Overseas Corporation*, 150 F.3d 1, 6 (1st Cir.1998). "Both Rule 49(a) and Rule 51 ... require the objecting party to state its objections after the charge but before the jury retires." *Wilson v. Maritime Overseas Corporation*, 150 F.3d at 6. "[S]imply referring by number to a request filed prior to the charge is not sufficient to preserve an objection to the court's failure to give the requested instruction." *Jerlyn Yacht Sales, Inc. v. Wayne R. Roman Yacht Brokerage*, 950 F.2d at 66. It is nevertheless sufficient if the party "makes known to the court the action which the party desires the court to take or the party's objection to the action of the court and the grounds thereof." *Wilson v. Maritime Overseas Corporation*, 150 F.3d at 7 (further noting that the emphasis is upon giving the court "actual notice of the nature and grounds of the objection").

On April 14, 1992, plaintiffs filed the proposed missing witness instruction which read as follows:

You may find, under the circumstances of this case, that "Where a party has knowledge of a person who can be located and brought forward, who is friendly to, or at least not hostiley disposed toward, the party, and who can be expected to give testimony of distinct importance to the case, the party would naturally offer that person as a witness. If, then, without explanation, he does not do so, the jury may, if they think reasonable in the circumstances, infer that person, had he been called, would give testimony unfavorable to the party." [32]

Furthermore, you must conclude, if you do, that the witness(es) was available to the party.

In this case, the Plaintiffs argue that Dr. McCarthy's staff persons in June 1991 through May 1992, Ellen Jones and Ellen Singleton are still employed by him and available to him to be witnesses on the issue of when the MRI was ordered in May, 1992.[33]

In light of plaintiffs' reliance entirely on Massachusetts criminal cases, this court directed plaintiffs to provide this court with a civil case. On April 16, 1998, prior to closing arguments and the final charge conference, this court held a charge conference, having provided counsel with a draft of the final instructions. Plaintiffs' counsel objected to the absence of the above-quoted missing witness instruction and provided this court with a citation to a civil case. Without ruling on the propriety of the instruction, this court stated that it would consider the case.

After hearing additional objections to the written draft of the instructions, Dr. McCarthy's counsel addressed the issue of argument to the jury on the missing witness issue albeit stating, erroneously, that this court "has declined, as I understand it, to give an instruction." In point of fact, however, this court had not definitively decided whether to allow plaintiffs' renewed request to include a missing witness instruction. Dr. McCarthy's

counsel then proceeded to point out that the two employees from Dr. McCarthy's office were equally available to plaintiffs' counsel to subpoena for deposition. She also stated that plaintiffs' counsel noticed the deposition of Dr. McCarthy's partner, Dr. Johnson, but subsequently decided not to go forward with the subpoenaed deposition. After hearing this argument, it was at that point in time when this court stated, unequivocally, that it "would not put an instruction in on the missing witness." [34]

Further advising the parties that, it was "fair game for the plaintiff[s] to say who [they] heard from and who [they] have not heard from," plaintiffs' counsel then advised this court that the missing witness issue also included Dr. Johnson. Dr. McCarthy's counsel strenuously objected to the matter, arguing that she did not make a representation to the jury that they would hear from Dr. Johnson. She also reiterated that no inference should be drawn by a witness' absence where he or she is available to both parties. After requiring plaintiffs' counsel to clarify that he intended to comment on both the absence of Dr. Johnson and the two office staff members, this court took a brief recess to consider the issue as well as other matters.

After reconvening, this court ordered plaintiffs' counsel to make no reference to the missing witnesses in his closing argument. Notwithstanding this order, plaintiffs' counsel proceeded to refer to the missing testimony during his closing argument.

■ The decision of whether to give a missing witness instruction is "committed to the sound discretion of the trial court." *United States v. Martinez*, 922 F.2d 914, 924 (1st Cir.1991); *accord Commonwealth v. Figueroa*, 413 Mass. 193, 595 N.E.2d 779, 784 (Mass.1992) (" 'party who wishes the [missing witness] instruction cannot require it of right' "); 2 Charles Allan Wright *Federal Practice and Procedure* § 489 (1982) (discretionary with judge whether to give missing

---

**32.** The proposed instruction then cites solely to Massachusetts criminal cases.

**33.** Punctuation is taken from the original proposed instruction.

**34.** After closing arguments and the giving of the charge, this court held a final charge conference in order for the parties to place their objections to the charge on the record. Plaintiffs' counsel preserved his objection to the absence of the missing witness instruction at that time.

witness instruction). The basis for allowing either argumentative comment or a request for a missing witness instruction "is the simple proposition that if a party has evidence which will illuminate questions in issue and fails to present it, it may be inferred that such evidence would be harmful to his case." *United States v. Johnson,* 467 F.2d 804, 808 (1st Cir.), *cert. denied,* 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973);[35] *accord Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893) ("if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable").

■ Ordinarily, three circumstances warrant an inference adverse to a party with respect to a missing witness. Thus, the proponents, i.e., plaintiffs, bear the burden of establishing that the missing witness "would have been 'favorably disposed' to testify in the government's behalf by virtue of his status or relationship to the parties, (2) 'peculiarly available' to the government, or (3) within the government's 'exclusive control.'" *United States v. Welch,* 15 F.3d 1202, 1214 (1st Cir.1993), *cert. denied,* 511 U.S. 1076, 114 S.Ct. 1661, 128 L.Ed.2d 377 (1994); *United States v. Lewis,* 40 F.3d 1325, 1336 (1st Cir.1994) (same). These principles apply in civil, *see Fleet National Bank v. Anchor Media Television, Inc.,* 831 F.Supp. 16, 32 (D.R.I.1993), *aff'g,* 45 F.3d 546 (1st Cir.1995); *Williams v. Citibank,* 190 B.R. 728, 732–733 (D.R.I.1996) (setting forth same three circumstances), as well as in criminal cases. *See United States v. DeLuca,* 137 F.3d 24, 38 (1st Cir.1998), *cert. denied,* — U.S. —, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998); *United States v. Lewis,* 40 F.3d at 1336.

■ "Absent a claim of favorable disposition, where a witness is equally available to either party there is ordinarily no basis for a missing witness instruction." *United States v. St. Michael's Credit Union,* 880 F.2d 579,

597 (1st Cir.1989). In the context of a claim of favorable disposition, the physical availability of a witness by subpoena or presence in the courtroom is immaterial. *See generally United States v. Spinosa,* 982 F.2d 620, 632 (1st Cir.1992) (missing witness instruction proper where witness is not physically available to party seeking "instruction, or, when an uncalled, but physically available, witness is so 'clearly favorably disposed' to the other party that the witness is considered legally unavailable"); *Oxman v. WLS–TV,* 12 F.3d 652, 661 (7th Cir.1993) (before party can argue adverse inference due to missing witness, party must establish either "(1) that the witness is physically available *only to* the opponent; or (2) that the witness has a relationship with the opposing party that practically renders his testimony unavailable to the moving party"). Practical or legal availability in a favorable disposition claim turns on the missing witness' disposition and relationship to the parties. *See United States v. Wright,* 573 F.2d 681, 684 (1st Cir.) (not improper for prosecution to comment on failure of defense to call witnesses, who were in courtroom throughout trial, inasmuch as trial court noted that witnesses were "clearly associated with the defendant"), *cert. denied,* 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978); *United States v. Johnson,* 467 F.2d at 809.

■ In the case at bar, plaintiffs could have issued subpoenas for Dr. Johnson and Dr. McCarthy's office staff members and conducted their depositions. *See* Fed. R.Civ.P. 32(a)(3) & 45(b)(2). Plaintiffs apparently made no such attempt with respect to Dr. McCarthy's office staff members. With respect to Dr. Johnson, plaintiffs' counsel did not deny or even address the representation made by Dr. McCarthy's counsel that he noticed Dr. Johnson's deposition but subsequently decided not to go forward with the deposition. Accordingly, plaintiffs failed to show that the missing witnesses were peculiarly available to Dr. McCarthy or within his exclusive control. *See, e.g., United*

---

**35.** Whether discussing the appropriateness of allowing argument to the jury or an instruction, the First Circuit generally employs the same analysis. *See, e.g., United States v. Wright,* 573 F.2d 681, 684 (1st Cir.) (applying analysis used

in *Johnson,* which concerned the appropriateness of an instruction to the jury, in determining propriety of prosecution's comments to jury with respect to missing witnesses), *cert. denied,* 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978).

*States v. Welch*, 15 F.3d at 1241–1215 (absent evidence that missing witness was not available to his cousin, the defendant, or that government, which provided the defendant with missing witness' last known addresses, interfered with the defendant's efforts to locate and produce the missing witness, court acted within its discretion in denying missing witness instruction); *United States v. Arias–Santana*, 964 F.2d 1262, 1268 (1st Cir.1992) (inasmuch as missing witness instruction required showing that missing witness was either peculiarly available or within exclusive control of opponent, there was no error to deny instruction because proponent offered no explanation for failure to attempt to subpoena witness); *United States v. Ariza–Ibarra*, 651 F.2d 2, 15–16 (1st Cir.) (inasmuch as the defendants never argued favorable disposition, propriety of missing witness instruction turned on whether witness was in government's control and because witness could be located and was equally available to both parties there was no error in failing to give instruction), *cert. denied*, 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981).

The propriety of a missing witness instruction or argument therefore turns on whether plaintiffs established that the missing witnesses were favorably disposed to testify on Dr. McCarthy's behalf. Although plaintiffs made no delineation between whether they sought an instruction and/or argument on the basis of favorable disposition, their proposed instruction refers to missing witnesses who are "hostiley disposed toward" the non-producing party. Dr. McCarthy employed Ellen Jones and Ellen Singleton as members of his office staff in May 1992. These individuals remained in Dr. McCarthy's employ at least until September 1997. The "employer-employee relationship is recognized as one creating practical unavailability" due to the economic ties of the employee to his employer. *Jones v. Otis Elevator Company*, 861 F.2d 655, 659–660 (11th Cir.1988) (collecting case law). Although former employees lack such economic ties and, thus, "are not as likely to be considered particularly available to the party as are current employees," Alan Stephens, J.D., Annotation, *Adverse Presump-*

*tion or Inference Based on Party's Failure to Produce or Examine Witness with Employment Relationship to Party—Modern Cases*, 80 A.L.R.4th 405, 419 (1990); *Breese v. State of Indiana*, 449 N.E.2d 1098, 1107 (Ind.App.1983) (collecting cases for principle that majority of jurisdictions "have held that no adverse inference should arise from the failure to produce a former employee as a witness"),[36] Ellen Singleton and Ellen Jones apparently remain in Dr. McCarthy's employ. Accordingly, plaintiffs sufficiently established the legal unavailability of Ellen Jones and Ellen Singleton.

Dr. Johnson, however, was Dr. McCarthy's partner as opposed to employee. It is unclear whether there were any economic ties between these two physicians or whether they simply shared office space. In fact, other than being identified as Dr. McCarthy's partner, the record is devoid of evidence to indicate the nature of the relationship between these two individuals. Inasmuch as it is plaintiffs' burden to show that Dr. Johnson would have been favorably disposed to testify in Dr. McCarthy's behalf, plaintiffs fail to establish a necessary prerequisite for allowing an argument to the jury or a missing witness instruction vis-a-vis Dr. Johnson.

Separate and apart from establishing favorable disposition, an adverse inference is not permissible "where the unpresented evidence would be merely cumulative." *United States v. Johnson*, 467 F.2d at 808; *accord United States v. Lewis*, 40 F.3d at 1336 ("judge should consider whether the witness could provide 'relevant, noncumulative testimony'"); *United States v. Welch*, 15 F.3d at 1215 n. 17; *United States v. Ariza–Ibarra*, 651 F.2d at 16 (adverse inference may not be drawn unless evidence shows that "witness would be relevant and noncumulative"). For example, where the testimony of a doctor's partners in a medical malpractice case was cumulative, there was no error in the failure of the trial court to refuse to give a missing witness instruction and to direct counsel not to comment on the failure to produce the

---

**36.** As stated in *Ogle v. St. John's Hickey Memorial Hospital*, 473 N.E.2d 1055, 1059 (Ind.App.1985),

the *Breese* decision was superceded by statute on other grounds.

missing witnesses. *Hitch v. Hall*, 42 Md. App. 260, 265, 399 A.2d 953 (Md.Ct.Sp.App. 1979); *see also Levande v. Dines*, 153 A.D.2d 671, 544 N.Y.S.2d 864, 865 (N.Y.App.Div. 1989) (trial court properly refused missing witness instruction where testimony of doctor who examined the plaintiff on the defendant's behalf would be cumulative and address matters not in dispute); *Breese v. State of Indiana*, 449 N.E.2d at 1107–1108 (no error to deny missing witness instruction where testimony of missing witnesses, psychiatric resident and psychiatric intern at the defendant/hospital where the decedent committed suicide, would be cumulative).

Dr. McCarthy testified that he performed a funduscopic examination and that Dr. Johnson simply confirmed his findings. In the event Dr. McCarthy called Dr. Johnson as a witness, his testimony would have been cumulative and subject to attack on the grounds of bias. Hence, it would have been sound trial tactics not to call Dr. Johnson to the stand. *See, e.g., Hitch v. Hall*, 42 Md. App. at 265, 399 A.2d 953 (recognizing these concerns). In light of the cumulative nature of his testimony, it would be inappropriate to allow an argument or to give a jury instruction with respect to Dr. Johnson.

Similarly, with respect to Ellen Jones and Ellen Singleton, Dr. McCarthy testified that, after he examined Carol Steinhilber on May 28, 1992, he personally arranged for the MRI to be conducted the following day. On the other hand, Carol Steinhilber testified that she telephoned Dr. McCarthy's office on Friday, May 15, 1992 and requested an MRI. According to Carol Steinhilber, Dr. McCarthy said that he would order the test.[37] She further testified that she telephoned Dr. McCarthy's office the following Tuesday and learned that nothing had been done to set up a date for the MRI. The office, however, informed her later that day that the MRI was scheduled for May 29, 1992. Depending on the content of Ellen Jones and Ellen Singleton's testimony, it would have been cumulative of either Carol Steinhilber's rendition of events or Dr. McCarthy's rendition of events with respect to the ordering of the MRI.

---

37. Counsel did not object to this testimony.

In addition, at trial it appeared to this court that plaintiffs' counsel was engaged in inappropriate tactics designed to obtain permission to comment to the jury on the missing testimony of Dr. Johnson and Dr. McCarthy's office staff members and to obtain a missing witness instruction. Plaintiffs' counsel offered no explanation for his failure to go forward with Dr. Johnson's deposition and his failure to depose Dr. McCarthy's office staff members. *See United States v. Spinosa*, 982 F.2d 620, 633 (1992) (notwithstanding that missing witness may have been favorably disposed to the government, the defendant's "tactics ... smack of gamesmanship" inasmuch as he had contact with the missing witness and offered no explanation for his failure to subpoena missing witness to testify at trial); *see also United States v. DeLuca*, 137 F.3d at 38 (noting that appellants made no attempt obtain testimony of missing witness and paraphrasing *Spinosa* wherein the defendant, who did not attempt to subpoena missing witness, was engaged in gamesmanship). Likewise, notwithstanding the favorable disposition of Dr. McCarthy's office staff members, plaintiffs' counsel's tactics in not attempting to subpoena them and Dr. Johnson to testify at trial is indicative of an attempt to obtain an after-the-fact advantage with a missing witness instruction and argumentative comment.

Plaintiffs' counsel's tactics became even more apparent when their counsel noted that he would prefer not to call Dr. Johnson as a witness in plaintiffs' case in chief. As stated by plaintiffs' counsel in reference to Dr. Johnson, "Why would I put him on as a witness on my part of the case? I'd have to take him on direct. He's not a defendant. I'd like to take him on cross, not direct."

Where, as here, Dr. McCarthy did not interfere with any attempt on the part of plaintiffs to contact and obtain the testimony of his two office staff members and Dr. Johnson and plaintiffs made no effort to obtain their testimony, this court has the discretion to deny a missing witness instruction as well as comment to the jury. *See United States v. Spinosa*, 982 F.2d at 632–633 (trial court

did not err in denying missing witness instruction where the defendant offered no evidence to support his contention that missing witness was not equally available, the government did not interfere with the defendant's attempt to produce the missing witness at trial, and the defendant offered no explanation for the failure to subpoena missing witness to testify at trial).

Finally, during closing arguments to the jury plaintiffs' counsel explicitly stated that Dr. Johnson examined Carol Steinhilber's eyes and then noted that, "The only one we see here is Dr. McCarthy." Raising such an argument to the jury significantly undercuts plaintiffs' argument that they were prejudiced by the failure to give a missing witness instruction.[38] *See United States v. Martinez,* 922 F.2d 914, 925 (1st Cir.1991) (allowing negative inference argument to jury significantly undercuts claim that failure to give missing witness instruction was detrimental); *United States v. Ariza–Ibarra,* 651 F.2d at 16 n. 22.

▆▆ In the alternative, any error in the failure to give a missing witness instruction or to allow argument was harmless. Turning to Dr. McCarthy's office staff members, they would have testified as to when the MRI was ordered. Assuming that the jury inferred that their testimony would support Theodore and Carol Steinhilber's testimony, it would not have substantially swayed the jury's verdict.

For example, if this court instructed the jury that it could draw an adverse inference, then the jury might have assumed that Dr. McCarthy's office staff members would have testified that the MRI was ordered in or around May 19, 1992, at the insistence of Carol and Theodore Steinhilber communicated through a number of telephone calls. Even if the jury had drawn such an adverse inference against Dr. McCarthy, however, the negative inference drawn from the failure of Ellen Jones and Ellen Singleton to testify

was cumulative of the testimony from Carol and Theodore Steinhilber.

It is also undisputed that whether Carol Steinhilber demanded the test or whether Dr. McCarthy determined the need for a test at the May 28, 1992 visit, the test took place on May 29, 1992.[39] In other words, when the MRI was ordered did not influence the timing of when the MRI took place and the timing and date of the surgery on May 30, 1992. Thus, the adverse inference did not impact or cause any additional delay in the surgery.

More specifically, not allowing the jury to draw an adverse inference did not prejudice the jury because it did not materially affect the central issue of whether Dr. McCarthy exercised the standard of care of an average neurologist at the time. *See Nieves–Villanueva v. Soto–Rivera,* 133 F.3d at 102 (finding harmless error and noting that improper testimony "was not central nor did it actually prejudice the jury's decision"). Dr. Leader–Cramer testified that no scan was indicated prior to May 28, 1992. By that time or on that date, the MRI had been ordered. The adverse inference would not have affected the date of the MRI and the date of the surgery. It thus would not have materially impacted plaintiffs' central argument, i.e., that Dr. McCarthy negligently delayed diagnosing Carol Steinhilber's meningioma. In short, any error in the failure to give a missing witness instruction or to allow argumentative comment with respect to Dr. McCarthy's office staff members did not affect plaintiffs' substantial rights.

Similarly, the refusal to allow argument or an instruction on Dr. Johnson's failure to testify did not involve a central issue or substantially sway the jury's verdict. Dr. Johnson's examination of Carol Steinhilber's eyes on May 28, 1992, is collateral to the primary issue of Dr. McCarthy's negligence. Dr. McCarthy testified that when he viewed the abnormal pulsing and the swelling of the optic nerve on May 28, 1992, that he set up

---

**38.** Plaintiffs' counsel also pointed out that Dr. McCarthy's office staff members did not explain a billing argument raised by Dr. McCarthy's counsel. Such an argument, however, did not pertain to the ordering of the MRI in May 1992.

**39.** Even according to Theodore Steinhilber's testimony, the MRI was scheduled for May 29, 1992.

the MRI for the following day. Dr. Leader–Cramer opined that Carol Steinhilber had not experienced papilledema for a long period of time prior to May 28, 1992. The May 29, 1992 notes describing Carol Steinhilber's physical examination state that, "Visual fields are full to confrontation." Denying plaintiffs' counsel the opportunity to argue the absence of Dr. Johnson would not have impacted the jury's finding that Carol Steinhilber failed in her burden of establishing Dr. McCarthy's negligence. Consequently, any error in the failure to allow argumentative comment or an instruction with respect to Dr. Johnson did not affect plaintiffs' substantial rights.

## III. JURY INSTRUCTIONS AS TO EXPERT WITNESSES

Plaintiffs also object to this court's failure to include their proposed instructions 41 and 42 on expert testimony in the general charge. At the charge conference prior to closing arguments, plaintiffs sufficiently made the substance of their objection known to this court. Plaintiffs also renewed their objection at the final charge conference after the giving of the charge. At this conference, plaintiffs provided this court with the specific number of the requested instructions, 41 and 42, and described the content of the proposed instructions.

Plaintiffs do not contend that the instruction on expert testimony which this court gave to the jury was incorrect. Rather, they assert that this court should have provided additional guidance in the form of two, limiting instructions. These proposed, limiting instructions concern the foundation for an expert witnesses' opinions and require the jury to give little or no weight to the testimony of Dr. McCarthy's experts if they find Carol Steinhilber's testimony credible because these experts ignored her testimony.

Plaintiffs' proposed instructions 41 and 42 respectively read as follows:

It is common as is the case here that medical experts often disagree on diagnosis and causation. Questions of conflicting evidence are for you the jury to determine. If you find as credible, the testimony that

Mrs. Steinhilber gave to you regarding what her complaints were from January 1991 to May 29, 1992 and what she says she told Dr. McCarthy, then you may/shall give little or no weight to the opinions of the defense experts who testified in this case who ignored the evidence from Mrs. Steinhilber when they gave their opinions that you found to be credible and believable.

You may give weight or find an expert's opinion to be believable and reliable *only if all* of the facts underpinning that opinion to be (sic) true. Thus where the defendant's experts have ignored the testimony of Mrs. Steinhilber regarding her symptoms and her complaints to Dr. McCarthy and if you find her testimony in whole or in part to be believable and credible, you must give no weight to those defendant's expert opinions which ignored her testimony.[40]

The instruction given to the jury on expert testimony was a standard instruction and reads as follows:

### EXPERT TESTIMONY

The rules of evidence provide that if scientific, technical, or specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify and state his opinion concerning such matters. In this case you have heard the testimony of a number of experts.

You should consider the expert opinions received in evidence in this case and give them such weight as you may think they deserve. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or that the opinion is outweighed by other evidence, then you may disregard the opinion entirely. It is also true that an expert should not guess in the sense of stating a conclusion from facts that do not

---

**40.** Punctuation, wording and emphasis is taken from the original proposed instructions.

tend to the stated conclusion any more than towards a contrary conclusion.

In requesting the above quoted, limiting instructions, plaintiffs' counsel argued that both Dr. Leader–Cramer and Dr. Richard L. Dallow [41] ("Dr.Dallow") "absolutely omitted any reference" to Carol Steinhilber's testimony and, in particular, her symptoms and the complaints she made to Dr. McCarthy. According to plaintiffs' counsel, since these experts ignored Carol Steinhilber's testimony their opinions have little or no weight because "they ignored those facts as the jury finds them."

First, the jury never reached the issue of causation. Accordingly, Dr. Dallow's alleged lack of reliance on Carol Steinhilber's testimony is not "inconsistent with substantial justice." Fed.R.Civ.P. 61.

Second, Dr. Leader–Cramer's testimony does not inevitably lead to a conclusion that he ignored Carol Steinhilber's testimony. It is true that on cross examination Dr. Leader–Cramer testified that, "My testimony is based on when [sic] Dr. McCarthy's notes record, yes. What Mrs. McCarthy [sic] did or didn't say I have no knowledge of." Dr. Leader–Cramer also agreed that he did not consider what Carol Steinhilber reported to Dr. McCarthy in rendering his opinions on the standard of care. He further agreed that his testimony was based only upon what was written in Dr. McCarthy's notes.[42]

Taken in isolation, this testimony fully supports plaintiffs' contention. The record, however, contains additional testimony from which the jury could find that Dr. Leader–Cramer did not discount and, in fact, reviewed and considered Carol Steinhilber's deposition testimony in the course of rendering his opinions. Reasoning that her testimony as to symptoms and complaints was not corroborated or supported by contemporary records at the time, however, he chose to instead rely on Dr. McCarthy's contempo-

raneously recorded records. Experts in the field of neurology would reasonably do the same.

On direct examination, Dr. Leader–Cramer testified that he reviewed the following materials: the medical records from Dr. McCarthy's office; the medical records from Cape Cod Hospital; certain opthamalogy records issued after Carol Steinhilber's June 1992 discharge from Cape Cod Hospital; follow-up neurological notes; medical records made by various physicians from the state of Florida; x-rays taken by the chiropractor who treated Carol Steinhilber prior to her June 1991 visit with Dr. McCarthy; and deposition testimony given by the parties which would therefore include Carol Steinhilber's deposition testimony. In addition, at one point during cross examination, he stated that in rendering his opinion[s], he took into account Carol Steinhilber's deposition testimony. He also stated that he did not discount Carol Steinhilber's complaints in her deposition but he did not "have anything to base it on at the time she was having the complaint."

Dr. Dallow testified that he primarily relied on the "eye records" both prior to and after the May 30, 1992 surgery. Dr. Dallow has also treated patients with visual field deficits similar to those of Carol Steinhilber. He noted that optometry records dated September 1991 showed normal papillary responses and visual fields on confrontation as well as normal brain processing of vision. He also pointed to Dr. Martin's May 29, 1992 description of her visual fields as "full to confrontation."

Recounting and reviewing records dated after the surgery, Dr. Dallow noted various findings by a Massachusetts physician who examined Carol Steinhilber in September 1992 as well as findings by a Florida physician and an optometrist thereafter. As documented by the records from the Florida physicians,[43] Dr. Dallow opined to a reasonable

---

**41.** Dr. Dallow is a board certified opthamalogist with staff privileges at a number of medical facilities including the Massachusetts Eye and Ear Infirmary in Boston.

**42.** See footnote 18 *supra.*

**43.** Dr. Dallow's files did not contain deposition transcripts or answers to interrogatories. Dr. Dallow testified by videotape at trial. Accordingly, plaintiffs imply that Dr. Dallow did not consider Carol Steinhilber's testimony in rendering his opinions.

degree of medical certainty that the probable cause of Carol Steinhilber's visual deficit was a vascular insult which occurred during the May 30, 1992 surgery.

■■ Rule 703, F.R.E., upon which plaintiffs based their proposed instructions,[44] "broadened considerably the permissible basis for expert opinions which had been limited at common law to '(1) information obtained by the expert's personal knowledge; (2) the hypothetical question ...; and (3) in some jurisdictions, testimony previously elicited during the trial, with the expert instructed to assume the truth of that evidence and to base his conclusion thereon.'" *Soden v. Freightliner Corporation,* 714 F.2d 498, 502 (5th Cir.1983). Rule 703, F.R.E., thus allows an expert to base "an opinion on inadmissible facts or data if 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Ricciardi v. Children's Hospital Medical Center,* 811 F.2d 18, 25 (1st Cir.1987) (quoting Rule 703, F.R.E.). "When the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury." *International Adhesive Coating Company, Inc. v. Bolton Emerson International, Inc.,* 851 F.2d 540, 545 (1st Cir.1988); *see also Coleman v. De Minico,* 730 F.2d 42, 47 (1st Cir.1984) (quoting *Polk v. Ford Motor Co.,* 529 F.2d 259, 271 (8th Cir.), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976)); F.R.E. 705.

Both Dr. Leader–Cramer and Dr. Dallow based their opinions on the type of records which an expert in their field would reasonably rely upon. *See, e.g., Kannankeril v. Terminix International, Inc.,* 128 F.3d 802, 807 (3rd Cir.1997); *Durflinger v. Artiles,* 563 F.Supp. 322, 327 (D.Kan.1981), *aff'g,* 727 F.2d 888, 892–893 (10th Cir.1984). It was for the jury to assess their credibility and the weight accorded to their testimony.

Instructing the jury that they should give no weight to Dr. Leader–Cramer's or to Dr. Dallow's opinions if they ignored the testimony of Carol Steinhilber not only misstates the record with respect to Dr. Leader–Cramer

but it unduly impinges upon the jury's function as the finder of fact. The instruction highlights certain testimony and suggests a conclusion to the jury.

■■ Furthermore, this court has "considerable latitude" in charging the jury as long as the charge as a whole adequately sets forth the law "applicable to the controlling issues." *United States v. Woodward,* 149 F.3d 46, 69 (1st Cir.1998). Thus, this court is not obligated to give the instruction in the language provided by plaintiffs if the substance of the requested instruction is contained in the given charge. *Gafford v. General Electric Company,* 997 F.2d 150, 166 (6th Cir.1993); *see also United States v. Woodward,* 149 F.3d at 69 ("court is not obligated to 'follow the exact form and wording of the defendant's proposed instruction'").

■■ In the case at bar, the given charge instructed the jury that they could disregard an expert's opinion if they concluded that the reasons given for the opinion were not sound. Plaintiffs' counsel pointed to the unsound basis for the opinions, i.e., Dr. Leader–Cramer's reliance on Dr. McCarthy's notes as opposed to Carol Steinhilber's testimony and Dr. Dallow's failure to review deposition transcripts and interrogatory answers, on cross examination as well as during closing argument.

The instruction on witness credibility also advised the jury that they are the sole judges of the weight to give a witness' testimony. The instruction further informed the jury that in weighing the testimony of a witness, they could consider the witness' "opportunity to observe or acquire knowledge concerning the facts about which he or she testified" and "the extent to which his or her testimony has been supported or contradicted by other credible evidence." The given instruction on witness credibility together with the given instruction on expert testimony adequately informed the jury of the role of expert testimony, the weight to accord an expert's opinions and the jury's role as the trier of fact. *See United States v. Miller,* 985 F.Supp. 1284, 1286 (D.Kan.1997) (same instruction on expert testimony and witness credibility "more than adequately informed the jury

44. Both proposed instructions 41 and 42 cite to Rule 703, F.R.E.

regarding the weight to be given the expert's testimony and the jury's role"); *see also Hoult v. Hoult,* 57 F.3d 1, 7–8 (1st Cir.1995) (citing with approval similar instruction on expert testimony); *United States v. Barnette,* 800 F.2d 1558, 1568–1569 (11th Cir. 1986) (similar instruction on expert testimony placed expert's opinion in proper perspective for the jury), *cert. denied,* 480 U.S. 935, 107 S.Ct. 1578, 94 L.Ed.2d 769 (1987); *see generally United States v. McCarty,* 440 F.2d 681, 682 (6th Cir.1971) (rejecting argument that court erred in denying requested expert witness instruction inasmuch as charge as a whole "included its purport"). Alternatively, plaintiffs also fail to demonstrate that the giving of the requested instructions would have changed the outcome of the trial.

Finally, as previously discussed, Rule 703, F.R.E., allows an expert to base an opinion on hearsay or other facts or data reasonably relied upon by experts in that particular field. Nevertheless, "It is not necessary for the court to instruct the jury with respect to this hearsay and other dangers associated with reliance by experts on non-admissible evidence." *United States v. Gallo,* 118 F.R.D. 316, 318 (E.D.N.Y.1987).[45] This is not the case where this court omitted an entire issue or claim from the given charge. Rather, plaintiffs simply requested limiting instructions on the foundation and underpinnings of expert testimony. Such a limiting instruction is not required.

In sum, the given charge did not confuse or mislead the jury with respect to expert testimony. Moreover, the failure to give instructions 41 and 42 did not amount to a clear miscarriage of justice. Accordingly, plaintiffs are not entitled to a new trial based on this argument.

### CONCLUSION

In accordance with the foregoing discussion, plaintiffs' motion for a new trial (Docket Entry # 80) is **DENIED.**

---

**45.** Although the above statement is dicta, it is worth noting that the author of the *Gallo* opinion is Chief Judge Jack B. Weinstein, author of the well known treatise on evidence bearing his name, *Weinstein's Federal Evidence* (1998).